## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| CHRISTOPHER SEAMAN, *et al*., | |
| *Plaintiffs*, | Case No.: 3:22-cv-00006 |
| v. | <u>MEMORANDUM OPINION</u> |
| COMMONWEALTH OF VIRGINIA., *et al*., | |
| *Defendants*. | Judge Norman K. Moon |

On January 15, 2022, the newly elected Governor of Virginia signed Executive Order 2, which provides that parents can opt their children out of masking requirements in Virginia's schools, even if the school or district has otherwise determined mandatory masking to be an appropriate COVID-19 prevention measure. On February 26, the Virginia legislature enacted Senate Bill 739, essentially codifying the same requirement in a Virginia statute, which went into effect on March 1.

Plaintiffs are the parents of twelve children who suffer from disabilities that put them at significant health risk should they contract COVID-19. They ask the Court to enjoin Virginia, its Governor and Attorney General and other Defendants, from enforcing E.O. 2 and S.B. 739, on the basis that those state laws violate their rights under federal law, specifically, the Americans with Disabilities Act (or ADA) and the Rehabilitation Act.

E.O. 2 and S.B. 739 are the law in Virginia. This is not a class action, and the twelve plaintiffs in this case have no legal right to ask the Court to deviate from that state law in any schools in Virginia (much less school districts) their children do not attend, or indeed even those

1

areas of their schools in which Plaintiffs' children do not frequent. In other words, only those schools Plaintiffs attend or would attend are directly impacted by this Court's decision.[1]

That said, federal law, namely the ADA and the Rehabilitation Act, affords Plaintiffs a right to request a reasonable modification from state or local laws. The challenged state laws (E.O. 2 and S.B. 739) are preempted inasmuch as they pose an obstacle to Plaintiffs' right. Defendants are therefore enjoined from enforcing E.O. 2 and S.B. 739 to the extent that such actions would seek to prevent or limit Plaintiffs' schools or school districts from considering in the first instance whether Plaintiffs' individualized requests for masking constitute a reasonable modification under federal law. Plaintiffs' motions for preliminary injunction are therefore granted in part to that extent. *See* Dkts. 4, 29.

## Background

1. *COVID-19*

As the CDC explains, COVID-19 "is a respiratory illness caused by SARS-CoV-2, a coronavirus discovered in 2019," which "spreads mainly from person to person through respiratory droplets produced when an infected person coughs, sneezes, or talks."[2] While some people may be asymptomatic, for those who do have symptoms "illness can range from mild to severe," and "people of any age with underlying medical conditions are at higher risk for severe illness." *Id.* Since the onset of the COVID-19 pandemic in 2020, nearly 80,000,000 in the United

---

[1] Albemarle County (Brownsville Elementary School), Bedford County (Stanton River Middle), Chesapeake (Grassfield Elementary, Southeastern Elementary), Chesterfield County (Enon Elementary), Cumberland County (Cumberland Elementary), Fairfax County (Stenwood Elementary), Henrico County (Quioccasin Middle), Loudoun County (Trailside Middle and Loudoun County High), Manassas City (Jennie Dean Elementary), York County (Tabb Middle). Am. Compl. ¶¶ 71, 83, 89, 98, 106, 119, 125, 135, 144, 154, 164, 174.

[2] CDC, *Coronavirus Disease 2019 (COVID-19)*, http://cdc.gov/dotw/covid-19/index.html (last visited March 14, 2022).

States have contracted the virus, resulting in over 968,000 deaths.[3] In Virginia, over 1,661,000 have contracted COVID-19, and 19,520 have died from the virus.[4] The CDC and the Virginia Department of Health have identified numerous measures that can be taken to reduce the risk of spread of COVID-19, including vaccination, social distancing, testing, avoiding poorly ventilated spaces and crowds, and, as relevant here, wearing masks.[5]

The CDC cautions that people with certain medical conditions and disabilities are more likely to get very sick from COVID-19, meaning they are more likely to be hospitalized, need intensive care, require a ventilator, or die.[6] These include, but are not limited to: people with cancer, chronic kidney disease, chronic liver disease, chronic lung diseases (including asthma if moderate to severe, COPD, or damaged or scarred lung tissue), cystic fibrosis, type 1 or type 2 diabetes, people with various disabilities (including cerebral palsy, birth defects, intellectual or developmental disorders, or Down syndrome), heart conditions, and immunocompromised persons. *Id.* Risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases. *Id.*

---

[3] CDC, *COVID Data Tracker*, http://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited March 21, 2022).

[4] Va. Dep't of Health, *COVID-19 Data in Virginia*, http://vdh.virginia.gov/coronavirus/ see-the-numbers/covid-19-in-virginia (last visited March 21, 2022).

[5] Va. Dep't of Health, *Protect Your Health: Masks*, http://vdh.virginia.gov/coronavirus/ protect-yourself/masks (last visited March 14, 2022) (stating, "[m]asks may help offer protection against COVID-19, including the Omicron variant," and providing "community level" tool to "help individuals and communities decide what prevention steps to take," including masking, "based on the latest data"); CDC, *How to Protect Yourself & Others*, http://cdc.gov/coronavirus/ 2019-ncov/prevent-getting-sick/prevention.html (last visited March 14, 2022) (recommending, among other things, that "[e]veryone ages 2 and older should properly wear a well-fitting mask indoors in public in areas where the COVID-19 Community Level is high, regardless of vaccination status.").

[6] CDC, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited March 17, 2022).

The CDC has advised everyone ages 5 and older to get vaccinated for COVID-19.[7] The CDC wrote that "COVID-19 can make children very sick and cause children to be hospitalized" and even in "some situations, the complications from infection can lead to death." *Id.* The CDC further advised that "[c]hildren are as likely to be infected with COVID-19 as adults and can get very sick from COVID-19; have short and long-term health complications from COVID-19, and spread COVID-19 to others, including at home and school." *Id.* The parties have submitted other evidence concerning COVID-19 health risks presented to children; and communicability of the virus in the school setting, addressed below.

2. *COVID-19 Policy in Virginia Schools*

Since the onset of the COVID-19 pandemic in early 2020, parents, students, school administrators, school boards, localities, states, and the country have grappled with how to balance the interests of children's education and public health in preventing or minimizing risk of spread of the virus.

In March 2020, following an initial short-term closure of schools for two weeks after the outbreak of COVID-19, the former Governor of Virginia issued Executive Order 53, which directed a "[c]essation of all in-person instruction at K-12 schools, public and private, for the remainder of the 2019-2020 school year," as a measure to reduce risk of spread of the virus. *See* Dkt. 44-3. Following a phased reopening approach to reopening first laid out by the then-Governor in March 2021, the Virginia legislature enacted Senate Bill 1303. This legislation provided that "[e]ach school board *shall offer in-person instruction* to each student enrolled in

---

[7] CDC, *COVID-19 Vaccines for Children and Teens*, https://tinyurl.com/5n82pvx8 (Jan. 11, 2022, last visited March 21, 2021).

the local school division in a public elementary and secondary school." Va. Acts. Ch. 456 (Spec. Sess. I) (S.B. 1303), § 2, *available at* 2020 VA S.B. 1303 (West.) (emphasis added).

But the in-person education provision in the legislation was not without limits. The legislation further stated that a school board shall "provide such in-person instruction in a manner in which it adheres, to the maximum extent practicable, to any currently applicable mitigation strategies for … elementary and secondary schools to reduce the transmission of COVID-19 that have been provided by the federal [CDC]." *Id.* And, in any event, "[i]f a local school board determines … that the transmission of COVID-19 within a school building is at a high level," the school board could temporarily shift to "fully remote virtual instruction" or a "combination of in-person and remote virtual instruction" for "the at-risk group of students indicated … or, if needed, the whole student population in the school building …." *Id.*, § 3(1). However, those measures could last "only for as long as it is necessary to address and ameliorate the level of transmission of COVID-19 in the school building." *Id.* The legislation further provided that school boards may also "provide fully remote virtual instruction to any enrolled student" upon parent or guardian request. *Id.*, § 3(2).

In May 2021, the former Governor issued Executive Order 79, which provided, in relevant part, that "[a]ll students, teachers, staff, and visitors must wear a mask over their nose and mouth while on school property," subject to certain exceptions. Dkt. 45-7 at 3. Exceptions included "[w]hile eating or drinking," "exercising or using exercise equipment," "playing a musical instrument," "[a]ny person who has trouble breathing" or who cannot "remove the mask without assistance," those who are "seeking to communicate with people who are deaf or hard of hearing and for which the mouth needs to be visible," or "[p]ersons with health conditions or disabilities that prohibit wearing a mask," and "[n]othing in this Order shall require the use of a

mask by any person for whom doing so would be contrary to his or her health or safety because of a medical condition." *Id.* at 2–3.

In August 2021, the Virginia Department of Health issued an order concluding that "[a] public health emergency due to COVID-19 continues to exist," and "requir[ing] all individuals aged two and older to wear masks when indoors at public and private K-12 schools to inhibit spread of the virus, as recommended and described by the CDC."[8] Exceptions to the requirement largely tracked those in E.O. 79, including when individuals are eating, drinking, sleeping, exercising, playing a musical instrument, "[a]ny person who has trouble breathing," "[p]ersons with health conditions or disabilities that prohibit wearing a mask," or "[a]ny person who has a disability or meets at-risk criteria or those assisting such persons, including those individuals with an Individualized Education Plan (IEP) or 504 plan under the Rehabilitation Act, where wearing a mask would inhibit communication or the receiving of services." *Id.*

3. *Executive Order 2 and Senate Bill 739*

On January 15, 2022, the newly elected Governor of Virginia signed Executive Order 2 (E.O. 2), which provided, in relevant part: "The parents of any child enrolled in a[n] elementary or secondary school or a school based early childcare and educational program may elect for their children not to be subject to any mask mandate in effect at the school's school or educational program." *See* Dkt. 1-1 at 3. E.O. 2 also stated that "[n]o parent electing that a mask mandate should not apply to his or her child shall be required to provide a reason or make any certification concerning their child's health or education." *Id.* And further, E.O. 2 provided that

---

[8] Virginia Department of Health, *State Health Commissioner Order of Public Health Emergency Statewide Requirement to Wear Masks in K-12 Schools* (Aug. 12, 2021), https://www.vdh.virginia.gov/content/uploads/sites/134/2021/08/PHE-Order_K-12_8-12-2021.pdf (last visited March 17, 2022).

"[a] child whose parent has elected that he or she is not subject to a mask mandate should not be required to wear a mask under any policy implemented by a teacher, school, school district, the Department of Education, or any other state authority." *Id.* E.O. 2 rescinded the prior E.O. 79 the State Health Commissioner's August 2021 order requiring masking in schools. *Id.*

On February 16, 2022, the Virginia legislature enacted Senate Bill 739 (S.B. 739), which went into effect on March 1, 2022. S.B. 739 also provides that parents can choose to have their children go without a mask at school, that no explanation is required for that decision, and no adverse disciplinary consequences can follow from it. *See* Va. Stat. § 21.1-2.1(C).

### 4. *The Plaintiffs*

Plaintiffs are parents of twelve children in public schools in ten school districts in Virginia, spanning pre-school to eleventh grade. *See supra* fn. 1. All have disabilities or illnesses that put them at an increased risk of severe injury or death if they contract COVID-19. Dkt. 24 ("Am. Compl.") ¶ 9. The parents have filed suit on their own and their children's behalf. *See id.* ¶¶ 21–32. For ease of reference, the Court refers to the children as "Plaintiffs." Plaintiffs include

> C.S. – An eight-year-old in third grade, who has been diagnosed with Philadelphia chromosome-positive (Ph+) acute lymphoblastic leukemia. C.S. suffered a relapse in June 2021, and is immunocompromised from chemotherapy, chimeric antigen receptor T-Cell (CAR-T) therapy, and a bone marrow transplant. Am. Compl. ¶ 21; Dkt. 5-1 ¶¶ 3–4.

> J.N. – A ten-year-old in fourth grade, who has been diagnosed with cystic fibrosis and pancreatic insufficiency, among other conditions. Am. Compl. ¶ 22; Dkt. 5-2 ¶¶ 2–3.

> B.B. – An eleven-year-old in sixth grade, who has been diagnosed with chronic lung disease, and who, as a result of his medical treatments, is immunocompromised. B.B. also has a decreased lung function and increased susceptibility to infections. Am. Compl. ¶ 23; Dkt. 5-3 ¶¶ 2–3.

> G.D. – A ten-year old in fifth grade, who has been diagnosed with asthma, and an autoimmune disorder known as Pediatric Autoimmune Neuropsychiatric Disorder associated with Streptococcus ("PANDAS"). Am. Compl. ¶ 24; Dkt. 5-4 ¶¶ 2–4.

J.D. – A seven-year-old in second grade, who has been diagnosed with cystic fibrosis. Am. Compl. ¶ 25; Dkt. 5-5 ¶¶ 2–3.

Q.O. – A thirteen-year-old in sixth grade, who has been diagnosed with Down Syndrome, Celiac disease (which is an autoimmune disease), and liver disease. Am. Compl. ¶ 26; Dkt. 5-6 ¶¶ 2–3.

R.M. – A fourteen-year-old in eighth grade, who has been diagnosed with cystic fibrosis. Am. Compl. ¶ 27; Dkt. 5-7 ¶¶ 2–3.

C.B. – A four-year-old in preschool, who has been diagnosed with "a reactive airway disease and Autism." Am. Compl. ¶ 28; Dkt. 37-1 ¶ 2.

I.C. – A thirteen-year-old in sixth grade, who has been diagnosed with "a medical respiratory disability that makes him severely prone to infections," and who has had twelve surgeries in his right lung, which is half the size of his left lung. Am. Compl. ¶ 29; Dkt. 5-8 ¶¶ 2–3.

M.K. – A three-year-old in preschool who has been diagnosed with Cornelia de Lange Syndrome (CdLS), which "causes severe developmental delays and disabilities, limb differences, and smaller features," and as a result of which, M.K. "is developmentally about one year old and uses a stroller and wheelchair." Am. Compl. ¶ 30; Dkt. 41-4 ¶¶ 2–3.

J.M. – A ten-year-old in fifth grade, who has been diagnosed with Type 1 diabetes. Am. Compl. ¶ 31; Dkt. 37-2 ¶¶ 2–4.

L.R. – A seventeen-year-old in eleventh grade, who has had two kidney transplants, and has been diagnosed with multiple disabilities including end-stage renal disease, a blood clotting disorder, medication-induced diabetes, and cognitive delays. Am. Compl. ¶ 32; Dkt. 37-3 ¶¶ 2–4.

Plaintiffs are fully vaccinated against COVID-19 to the extent eligible. J.N., G.D., J.D. and J.M. are fully vaccinated but not yet eligible for booster.[9] R.M. is fully vaccinated.[10] B.B., Q.O. and I.C. are vaccinated and have received a booster.[11] L.R. has received three doses of the vaccine and will be receiving a fourth dose.[12] C.B. and M.K. are too young to be eligible for

---

[9] Dkt. 5-2 ¶ 4; Dkt. ¶ 5-4 ¶ 6; Dkt. 5-5 ¶ 6; Dkt. 37-2 ¶ 6.

[10] Dkt. 5-7 ¶ 6.

[11] Dkt. 5-3 ¶ 3; Dkt. 5-6 ¶ 4; Dkt. 5-8 ¶ 3.

[12] Dkt. 37-3 ¶ 7.

vaccination.[13] And C.S. "has not been able to receive his COVID-19 vaccines yet because of the cancer treatment's impact on C.S.'s immune system."[14] In any event, there is no dispute that Plaintiffs' diagnoses and illnesses put them at an increased risk of severe injury or death if they contract COVID-19, notwithstanding their vaccination status.[15]

Plaintiffs were going to school in-person during the 2021-2022 academic year while their schools had a universal masking policy.[16] Many described how virtual learning options the prior year were difficult academically or did not provide sufficient support, and so they sought out the in-person option this academic year.[17] Some Plaintiffs, including J.N., G.D., J.D., Q.O., I.C., M.K. and J.M., currently have no available virtual learning option.[18] C.S. is currently receiving

---

[13] Dkt. 37-1 ¶ 3; Dkt. 41-1 ¶ 4.

[14] Dkt. 5-1 ¶ 9.

[15] *See, e.g.*, Dkt. 5-1 ¶¶ 6, 9 (C.S.); Dkt. 5-2 ¶ 3 (J.N.); Dkt. 5-3 ¶ 3 (B.B,); Dkt. 5-4 ¶ 6 (G.D.); Dkt. 5-5 ¶ 6 (J.D.); Dkt. 5-6 ¶¶ 2–4 (Q.O.); Dkt. 5-7 ¶ 6 (R.M.); Dkt. 37-1 ¶¶ 2–3 (C.B.); Dkt. 5-8 ¶ 3 (I.C.); Dkt. 41-1 ¶¶ 2–5 (M.K.); Dkt. 37-2 ¶ 6 (J.M.); Dkt. 37-3 ¶¶ 3–7, 14 (L.R.).

[16] *See* Dkt. 5-1 ¶ 13 (C.S.); Dkt. 5-2 ¶¶ 8–9 (J.N.); Dkt. 5-3 ¶ 6 (B.B.); Dkt. 5-4 ¶¶ 8, 10 (G.D.); Dkt. 5-5 ¶¶ 9–10 (J.D.); Dkt. 5-6 ¶¶ 6–9 (Q.O., stating if "there is no longer a mask mandate at [Q.O.'s school], I will be forced to withdraw Q.O. from school for his health and safety"); Dkt. 5-7 ¶ 8 (R.M.); Dkt. 37-1 ¶¶ 4–7 (C.B.); Dkt. 5-8 ¶ 6 (I.C.); Dkt. 41-1 ¶¶ 2, 6, 11 (M.K.); Dkt. 37-2 ¶ 10 (J.M.); Dkt. 37-3 ¶ 11 (L.R. attended school in person in November and December 2021, when local "PCR test positivity rates are at a safe level of L.R., as determined by her medical providers").

[17] *See, e.g.*, Dkt. 5-2 ¶ 5 (J.N., when he attended school virtually last year, "[b]ecause of his diagnoses, J.N. struggled with focusing on tasks, organization, and navigating assignments"); Dkt. 5-3 ¶ 5 (B.B., although "able to maintain his grades and educational progress" during virtual school, his "emotional and mental health suffered"); Dkt. 5-4 ¶ 6 (G.D.); Dkt. 5-6 ¶ 6 (Q.O.); Dkt. 5-7 ¶ 7 (R.M.); Dkt. 5-8 ¶ 4 (I.C.); Dkt. 37-2 ¶ 9 (virtual education in 2020-2021 year "severely exacerbated J.M.'s depression as there was a lack of appropriate social development opportunities in the virtual setting"); *see also* Dkt. 37-3 ¶ 10 (L.R. previously attended virtual school but parents chose not to pursue this option this year because "it would deny L.R. access to in-person learning for the entire year").

[18] Dkt. 5-2 ¶ 7 (J.N.); Dkt. 5-4 ¶ 8 (G.D., virtual learning options unavailable because "there are currently no open seats," parents work, and "virtual learning is unable to meet G.D.'s needs"); Dkt. 5-5 ¶ 8 (J.D. has "no virtual education options available … and the deadline to enroll in the statewide virtual option has passed"); Dkt. 5-6 ¶ 7 (Q.O.'s county "is not offering a

virtual homebound education and intends to return to in-person instruction when "his treatment allows it and it is safe to do so." Dkt. 5-1 ¶ 15; *see also* Dkt. 50-11 ¶ 13. L.R. is also receiving homebound education virtually while COVID-19 test positivity rates indicate to her physicians it is unsafe for her to return to school. Dkt. 37-3 ¶ 14.

Many Plaintiffs have been advised by their physicians of the importance of a universal masking policy in their schools, and the risks presented to Plaintiffs by a voluntary-mask policy. The nature and scope of such recommendations, and the descriptions of their significance, vary to some extent based on the child's specific circumstances.

Some physicians' recommendations reference the amount of community spread of COVID-19 as a relevant factor. For J.N., who has cystic fibrosis, "[o]n the advice of [his] pediatrician, if there is no longer a mask mandate at [his] elementary school, [his parents] will be forced to withdraw [him] from school for his health and safety, *especially during periods of high transmission*." Dkt. 5-2 ¶ 10 (emphasis added); *see also id.* at 4 (email from J.N.'s doctor, stating that "At times of *high community spread* of COVID I strongly recommend that children with cystic fibrosis wear a mask at all times when indoors and when around others outdoors. Additionally, at times of *significant community spread of COVID*, both children and adults who are in contact with a child with cystic fibrosis in a school setting should also wear a mask.") (emphases added). For J.D., who also was diagnosed with cystic fibrosis, his medical provider "recommends having J.D. and [his] family follow the [CDC] and Cystic Fibrosis Foundation

---

remote learning option for the 2021-2022 school year"); Dkt. 5-8 ¶ 7 ("There is currently no virtual school option for I.C. for the 2021-2022 school year," but even if there was, it would not "provide an equitable educational experience" for I.C.); Dkt. 41-1 ¶ 9 (M.K., virtual learning "not appropriate" given her level of development); Dkt. 37-2 ¶ 17 (J.M., stating that "Virtual Virginia is the only virtual education program available" in his school division, and there is "currently no open space in this program").

advice of universal masking at all times." Dkt. 5-5 ¶ 7. In a letter submitted, J.D.'s physician

supported masking in schools during the COVID-19 pandemic, and his parents' request "*to*

*provide homebound teaching for him until the current surge is behind us*." Dkt. 37-6 at 2–3

(emphasis added). R.M.'s treating doctor, who is Director of the Cystic Fibrosis Center at

University of Virginia, "recommends universal masking in the school setting especially for those

with conditions that put them at heightened risk, such as cystic fibrosis." Dkt. 5-7 ¶ 5; *see also*

Dkt. 5-7 (letter from doctor, describing risks to those with cystic fibrosis, the "exploding" spread

of Omicron variant, and concluding that: "It is my strong recommendation that all schools

continue to require that staff and students wear masks."). And for B.B., "[i]f the school district

no longer required universal masking and *there is community transmission of COVID-19 above*

*the 'low' level*," B.B.'s pediatrician "has recommended against B.B. attending in person" given

his health conditions. Dkt. 5-3 ¶ 7 (emphasis added); Dkt. 37-5 at 2 (B.B.'s doctors, stating that

they "recommend against in person instruction for [B.B.] in the event that there is community

transmission above 'low' and mask optional in the classroom as this would pose too great a risk

to him for contracting covid 19."). It appears that L.R.'s medical providers are on an on-going

basis determining when "PCR test positivity rates are at a safe level for L.R." to attend school in-

person. Dkt. 37-3 ¶ 11.

Various physicians' recommendations on masking reference specific guidelines, such as

the CDC guidelines. For example, G.D.'s "doctor recommends that all [CDC] COVID-19

guidelines be used to protect him, especially masking indoors." Dkt. 5-4 ¶ 9. Q.O.'s doctors

similarly recommended "universal masking for in-person learning and to follow the CDC

guidelines." Dkt. 5-6 ¶ 5. And, as described above J.D.'s doctor referenced the Cystic Fibrosis

Foundation Guidelines, as well as CDC and American Academic of Pediatrics recommendations.

Dkt. 37-6 at 2. *See also* Dkt. 37-2 ¶ 8 (J.M.'s pediatrician recommended that his family "follow all recommendations from the [ADA] and the [CDC]").

Some recommendations are specifically based on the course of treatment or the Plaintiffs' abilities. For example, C.S.'s parents attested that he "will not be able to return to in-person instruction unless universal masking was in place at his school without opt-outs," as, "[b]ased on advice [they] have received from C.S.'s physicians, one-way masking would not be sufficient to adequately protect C.S. from COVID-19 such that he could safely attend school in person." Dkt. 50-11 ¶ 13. C.S. is currently receiving virtual homebound education and intends to return to school "as soon as his treatment allows it and it is safe to do so." Dkt. 5-1 ¶ 15. For M.K., as she is not able to wear a mask herself given her stage of mental development, her "doctors have recommended that [her family] follow the CDC guidelines of universal masking at all times." Dkt. 41-1 ¶ 5. The risks to health, or lack of education, were occasionally both presented in the physicians' recommendations.[19]

5. *COVID-19 Risk in Plaintiffs' Schools and Communities*

As of March 15, 2022, Virginia Department of Health statistics showed that seven of the ten localities at issue show "*high*" or "*substantial*" levels of community transmission of COVID-19, while three showed a "moderate" level.[20] No locality at issue in this case reflected a "low"

---

[19] For I.C., for example, "[o]n the advice of [I.C.'s] pediatrician, if there is no longer a mask mandate at [his school]," his parent "will have to choose between sending I.C. to school where is health and safety is at heightened risk or withdrawing I.C. from school and risking his educational progress." Dkt. 5-8 ¶ 9.

[20] As of March 15, 2022, there was "high" level of community transmission in Bedford County, Chesterfield County, Cumberland County, and Loudoun County; a "substantial" level in Albemarle County, Fairfax County, and Henrico County; and a "moderate" level in Chesapeake, Manassas and York County. *See* Virginia Dep't of Health, *COVID-19 Level of Community Transmission*, https://www.vdh.virginia.gov/coronavirus/see-the-numbers/covid-19-in-virginia/community-transmission/.

level of community transmission using the Health Department's metrics. Virginia calculated[21] those levels based upon new COVID-19 cases and test positivity rates in the area.[22]

As of March 17, 2022, the CDC website reflected that just one of the ten localities at issue is in a "*medium*" COVID-19 community level under their guidelines; while the other nine are in a "*low*" level.[23] Unlike Virginia's figures, however, CDC levels are based on three metrics: new COVID-19 *admissions* per 100,000 population in the last 7 days; the "percent of staffed inpatient beds occupied by COVID-19 patients"; and the total new COVID-19 cases per 100,000 population in the last 7 days.[24] In other words, CDC levels attempt to provide "[a] measure of the impact of COVID-19 illness on health *and healthcare systems*," and the "current potential for *strain on the health system*," *id.* (emphases added), rather than focusing solely on measuring spread of COVID-19 in the community. CDC's new guidelines provide that in a CDC "high" community level, people generally should "wear a mask indoors in public"; in a "medium" level, people should  "talk to your healthcare provider about whether you need to wear a mask and take other precautions" if you "are immunocompromised or high risk for severe

---

[21] On March 15, 2022, the Virginia Department of Health website removed its community transmission data from its website, and instead began redirecting visitors to the CDC COVID-19 Community Levels.

[22] The Health Department's own metrics provided: "high" community transmission was based on either a 10 percent or greater PCR test positivity rate or more than 100 new cases per 100,000; a "substantial" level reflects between 8 and 10 percent test positivity or between 50 and 100 new cases per 100,000; a "moderate" level reflects between 5 and 8 percent test positivity or between 10 to 49 new cases per 100,000; and, lastly, a "low" level of community transmission reflects under 5 percent test positivity and less than 10 new cases per 100,000. *See id.*

[23] As of March 17, 2022, CDC reflects a "medium" COVID-19 community level in Cumberland County, and a "low" community level in Albemarle County, Bedford County, Chesapeake, Chesterfield County, Fairfax County, Henrico County, Manassas, Loudoun County, and York County. *See* CDC, *Know Your COVID-19 Community Level*, http://cdc.gov/coronavirus/2019-ncov/your-health/covid-by-county.html.

[24] CDC, *COVID-19 Community Levels*, http://cdc.gov/coronavirus/2019-ncov/science/community-levels.html (last visited March 15, 2021).

disease"; and in a "low" level, other steps are recommended but masking is not specifically indicated as a community level matter.[25] However, the CDC states that regardless of community levels, "[p]eople may choose to wear a mask at any time," *id.*, and continues to advise that "[w]ear[ing] a well-fitting mask when recommended" can help protect those at higher risk of COVID-19.[26]

There has been a significant downtrend of COVID-19 cases in these areas since February. *See* Am. Compl. ¶ 3 (writing that, as of February 17, 2022, all but two regions in Virginia were in "high" community transmission levels under Virginia Department of Health data); Dkt. 50 at 10 (writing that, as of March 3, 2022, 108 of 133 localities in Virginia continued to have "high" levels of community transmission). Nonetheless, while COVID-19 cases have dropped, CDC data is showing an increasing number of cases of "Omicron Variant BA.2," in the United States.[27]

6. *Procedural History*

On February 1, 2022, Plaintiffs filed their original complaint, naming as Defendants the Commonwealth of Virginia, Governor of Virginia Glenn Youngkin, its Attorney General Jason Miyares, Superintendent of Public Instruction Jillian Balow, and Acting Health Commissioner Colin Greene, who were sued in their official capacities. Dkt. 1. Therein, Plaintiffs sought to

---

[25] *See* CDC, *Know Your COVID-19 Community Level*, http://cdc.gov/coronavirus/2019-ncov/your-health/covid-by-county.html (last visited March 21, 2022).

[26] CDC, *What you Can Do If You are At a Higher Risk of Severe Illness from COVID*-19, https://www.cdc.gov/coronavirus/2019-ncov/downloads/COVID19-What-You-Can-Do-High-Risk.pdf (last visited March 21, 2022).

[27] CDC, *COVID Data Tracker: Variant Proportions*, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last visited March 21, 2022) (showing rise of Omicron variant BA.2 cases from account for just 2.2% of total cases in United States on February 12, 2022, to 23% on March 12, 2022); *see also* Dkt. 5-12 ¶ 23 (Decl. of Dr. Garner).

enjoin and declare unlawful E.O. 2, which Plaintiffs argued "strips schools of their ability to comply with their obligations to students with disabilities under the Americans with Disabilities Act and Rehabilitation Act." *Id.* at 1. Plaintiffs claimed violations of Title II of the ADA, § 504 of the Rehabilitation Act, and federal preemption of E.O. 2. *Id.* ¶¶ 179–214.

On February 10, 2022, Plaintiffs filed a motion for a temporary restraining order and for preliminary injunctive relief. Dkt. 4. Therein, Plaintiffs asked the Court to issue a temporary restraining order as against Defendants and their "officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with Defendants" from "implementing, giving any effect to, issuing any guidance adopting, imposing any fines or withholding any funding in connection with, or bringing any legal actions to enforce Executive Order 2 as applied to public schools or school districts." Dkt. 4-1 at 5. On February 17, the Court scheduled a status conference to be held on February 22. Dkt. 20. Defendants' counsel entered their appearances thereafter.

On February 18, 2022, two days after S.B. 739 was enacted, Plaintiffs filed the operative amended complaint. Dkt. 24. Plaintiffs raised the same three causes of action, this time as against both E.O. 2 and S.B. 739. *Id.* ¶¶ 185–220.

At the status conference on February 22, 2022, the Court afforded the parties the ability to set a briefing schedule that would result in a hearing on February 28, 2022, before S.B. 739 was to enter into effect on March 1, 2022. But the parties agreed on a longer timeline, which the Court adopted. Dkt. 38. Pursuant to the agreed schedule, Plaintiffs filed a supplemental motion for a TRO and preliminary injunctive relief on February 22, Dkt. 29, Defendants responded to the motions by February 28 (also filing a motion to dismiss), Dkts. 43, 46, and Plaintiffs filed a reply by March 3, 2022, Dkt. 50.

The Court held a hearing on the motions on March 7, 2022. Following that hearing, Plaintiffs filed a notice of supplemental authority on March 9, to which Defendants filed a response on March 10. Dkts. 58, 59.

## Standard of Review

A plaintiff seeking a preliminary injunction must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that the injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. A court considering whether to impose a preliminary injunction "must separately consider each *Winter* factor." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citing *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)).

## Overview

The parties have raised two preliminary issues. *First*, Defendants argue that Plaintiffs have not demonstrated that they have standing to bring this suit, and therefore the Court should deny the motion and dismiss for lack of jurisdiction. *Second*, Defendants argue that Plaintiffs are required to (but did not) exhaust their administrative remedies pursuant to the Individuals with Disabilities Education Improvement Act (or IDEA), 20 U.S.C. § 1400 *et seq.*, before bringing this suit. The Court concludes Plaintiffs have established standing and that the IDEA does not require Plaintiffs to first exhaust their administrative remedies before bringing this case.

*Third*, on the merits, the parties dispute whether mandatory masking is a necessary and reasonable modification under federal law. Plaintiffs say it is, or that they should at least be able

to ask that a school make its own determination. In Defendants' view, required mask-wearing is not reasonable or necessary. The Court *need not* and *cannot* rule as a matter of law that required masking is or is not reasonable in all school districts as applied to all student bodies. What federal law requires is a fact-specific inquiry into reasonableness. E.O. 2 and S.B. 739 cannot preclude Plaintiffs from asking for some required masking as a reasonable modification, nor bar their schools from implementing some required masking, if doing so would, in fact, be a reasonable modification. *Fourth*, the Court considers the scope of injunctive relief, limiting it to these twelve Plaintiffs and such requests for reasonable modifications as they may make to their school districts. The injunction extends no further.

### Standing

Article III of the Constitution limits the jurisdiction of federal courts to deciding "Cases" and "Controversies." "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). This requirement, "built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 408 (2013).

To have standing, a plaintiff must "[1] present an injury that is concrete, particularized, and actual or imminent; [2] fairly traceable to the defendant's challenged behavior; and [3] likely to be redressed by a favorable ruling." *Davis v. Fed. Elec. Comm'n*, 554 U.S. 724, 733 (2008). "For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019); *see also Vill. of Arlington Heights v. Met. Housing Dev. Corp.*, 429 U.S. 252, 263–64 (1977) (similar). Plaintiffs,

as the party invoking federal jurisdiction, bear the burden of establishing these elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

1.  *Injury in Fact*

Defendants' first argument is that Plaintiffs have failed to allege the required injury in fact. Dkt. 46 at 11–15. They focus on Plaintiffs' claim that E.O. 2 and S.B. 739 have injured them by creating a "Hobson's choice: expose their children to an educational environment that increases their risk of contracting, and suffering severe illness from, COVID-19 or keep them out of school and isolated from their teachers and peers." *Id.* at 11 (citing Plaintiffs' Suppl. Mot. For TRO at 4). In Defendants' view, Plaintiffs face no such "binary choice," and their allegations fail to establish injury in fact from E.O.2 and S.B. 739, considering the various other possible "accommodations available to the plaintiffs (*e.g.*, distancing, voluntary masking, class spacing, plexiglass, and vaccinations)." *Id.* at 11–12 (quoting *E.T. v. Paxton*, 19 F.4th 760, 766 (5th Cir. 2021)).[28] Defendants argue that Plaintiffs are free to work with their schools to find "alternate strategies to reduce their risk of contracting COVID-19, apart from mandating that all *other* students wear masks," suggesting that such "additional accommodations" could include "masking requirements for teachers or staff when in close proximity to Plaintiffs; physical distancing from unmasked students; voluntary masking; improved ventilation; or distance learning, where appropriate." *Id.* at 12.

Plaintiffs respond that they have shown an injury in fact on several grounds. First, they argue that "[p]arents have standing to sue when practices and policies of a school threaten their

---

[28] While Plaintiffs generally use the term "reasonable modifications" and Defendants use the term "reasonable accommodations," the parties appear to use the terms interchangeably. *See also Paulone v. City of Frederick*, 787 F. Supp. 3d 360, 371–72 (D. Md. 2011) (discussing the equivalence of "reasonable accommodations" and "reasonable modifications").

rights and interests and those of their children." Dkt. 5 at 28 (citing *Arc of Iowa v. Reynolds*, 24 F.4th 1162, 1169 (8th Cir. 2022)). In this case, Plaintiffs contend that they have submitted evidence demonstrating that E.O. 2 and S.B. 739 caused "an injury to their children's educational interests and opportunities," by "forc[ing] them to forego critical educational opportunities, including in-person learning with their peers." *Id.* Second, Plaintiffs assert that they have demonstrated a substantial risk of bodily harm, which independently satisfies the injury requirement. *Id.* at 28 (citing *Arc of Iowa*, 24 F.4th at 1169). Third, Plaintiffs contend that "the discrimination, itself, is an injury to Plaintiffs sufficient to confer standing." Dkt. 50 at 14 (citations omitted).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). While "imminence is concededly a somewhat elastic concept," a "threatened injury must be *certainly impending* to constitute injury in fact," and "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (cleaned up). Rather, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 414 n.5) (cleaned up).

There is no dispute that Plaintiffs suffer from disabilities or illnesses that put them at substantial risk of serious bodily injury or worse, should they contract COVID-19. *Compare* Dkt. 5 at 11–17; Dkt. 46 at 7–8, 11–19, 29–32. For instance, C.S. (an eight-year-old in third grade) has been diagnosed with leukemia. After suffering a relapse in June 2021, C.S. remains immunocompromised as a result of "chemotherapy, chimeric antigen receptor T-Cell (CAR-T)

immunotherapy, total body irradiation, and a bone marrow transplant"—conditions that "put him at a higher risk of severe complications if he were to become infected with COVID-19." Dkt. 5-1 ¶¶ 3–6, 14. Indeed, even a mild COVID-19 case would "interrupt ongoing cancer treatment and rehabilitation." *Id.* ¶ 6. J.N. (a ten-year-old in fourth grade) was diagnosed with cystic fibrosis and pancreatic insufficiency, among other conditions. Dkt. 5-2 ¶ 2. J.N.'s diagnoses put him at higher risk of severe complications if he contracted COVID-19, which could include a needed lung transplant, permanent damage to lung tissue, decreased lung function, or death. *Id.* ¶ 3.[29]

The crux of the parties' dispute is whether Plaintiffs have shown actual or threatened future injury that is "'certainly impending,' or there is a 'substantial risk' that the harm will occur," *Driehaus*, 573 U.S. at 158—which shows injury in fact—or whether they have merely shown "*possible* future injury"—which would not. On this record, Plaintiffs have demonstrated the former, satisfying the injury in fact requirement for standing.

First, Plaintiffs have alleged, and record evidence reflects, that the Virginia laws' ban on mask requirements "force[d] [Plaintiffs] to forego critical educational opportunities, including in-person learning with their peers," and so Plaintiffs have shown that they are suffering and will

---

[29] *See also* Dkt. 5-3 ¶¶ 2–4 (B.B., who is eleven years old in sixth grade, was diagnosed with chronic lung disease, and has substantially decreased lung function); Dkt. 5-5 ¶¶ 2–4 (J.D., a seven-year-old in second grade, diagnosed with cystic fibrosis); Dkt. 5-6 ¶¶ 2–4 (Q.O., who is thirteen years old in sixth grade, diagnosed with Down Syndrome, Celiac disease and liver disease); Dkt. 5-7 ¶¶ 2–4 (R.M., who is fourteen years old in eighth grade, diagnosed with cystic fibrosis); Dkt. 5-8 ¶¶ 2–4 (I.C., who is thirteen years old in sixth grade, has been diagnosed with "a medical respiratory disability that makes him severely prone to infections," has had twelve surgeries in his right lung); Dkt. 37-1 ¶ 2 (C.B., a four-year-old in pre-kindergarten, has been diagnosed with autism and reactive airway disease); Dkt. 37-2 ¶¶ 2–4 (J.M., a ten-year-old in fifth grade, has been diagnosed with Type 1 diabetes); Dkt. 37-3 ¶¶ 2–4 (L.R., who is seventeen in eleventh grade, has had two kidney transplants and has been diagnosed with end-stage renal disease, medication induced diabetes, and a blood clotting disorder); Dkt. 41-1 ¶¶ 2–3 (M.K., who is three years old in preschool, has been diagnosed with Cornelia de Lange Syndrome (CdLS), which "causes severe developmental delays and disabilities, limb differences, and smaller features").

continue to suffer an injury to the children's "educational interests and opportunities." *Arc of Iowa*, 24 F.4th at 1169. Indeed, Plaintiffs' treating physicians have advised Plaintiffs against pursuing an otherwise vital in-person education in an environment lacking required masking, on account of the additional risks that it would pose to their health. *See, e.g.*, Dkt. 37-6 (J.D.'s doctor writing that, on account of J.D.'s cystic fibrosis and "higher risk for severe illness from the virus," if the school district does not require masks, he would support J.D.'s remote education although "in-person learning is vital"); Dkt. 37-5 (B.B.'s doctors advising that they would "recommend against in person instruction for [B.B.] in the event that there is community transmission above 'low' level and mask optional in the classroom as this would pose too great risk to him for contracting covid 19"); Dkt. 5-2 at 4 (J.N.'s doctor writing that, "at times of significant community spread of COVID, both children and adults who are in contact with a child with cystic fibrosis in a school setting should also wear a mask").[30] This is, simply put, not a situation in which plaintiffs have alleged only "speculative or tentative harm" from a ban on mask-mandates, given various "other preventive measures available to plaintiffs and the schools they attend." *See E.T.*, 19 F.4th at 766. Indeed, all parties acknowledge the importance of in-

---

[30] *See also* Dkt. 5-1 ¶ 17 ("C.S.'s medical provider has expressed concern regarding the risk of transmission to C.S. if C.S. or [his brother] O.S. is exposed to unmasked and unvaccinated children"); Dkt. 50-11 ("Based on advice we have received from C.S.'s physicians, one-way masking would not be sufficient to adequately protect C.S. from COVID-19 such that he could safely attend school in person."); Dkt. 5-7 ¶ 5 ("R.M.'s treating doctor, the director of the Cystic Fibrosis Center at The University of Virginia, recommends universal masking in the school setting especially for those with conditions that put them at heightened risk, such as cystic fibrosis."); Dkt. 5-6 ¶ 9 ("On the advice of Q.O.'s pediatrician, if there is no longer a mask mandate at [his middle school], I will be forced to withdraw Q.O. from school for his health and safety."); Dkt. 41-5 ¶ 10 ("As stated by [L.R.'s] kidney transplant doctor, community PCR test positivity rates must be much lower for L.R. to be safe in unmasked settings than when she is in a setting with universal masking, due to the increased risk of transmission when exposed to others who are unmasked.").

person education.[31] And further still, Plaintiffs' declarations almost uniformly describe varied—but none the less substantial—shortcomings in remote learning options.[32] All substantiating the concrete harm being inflicted (or imminently impending) by Plaintiffs being forced to forego in-person instruction under these circumstances.

Second, but relatedly, Plaintiffs demonstrated "a substantial risk of bodily harm, which independently satisfies the injury requirement." *Arc of Iowa*, 24 F.4th at 1169; *see also Driehaus*, 573 U.S. at 158 (asking whether there is a "'substantial risk' that the harm will occur"). Again, there is no dispute that Plaintiffs all have disabilities and illnesses that put them at significant risk of serious bodily harm or worse if they contract COVID-19. Moreover, while data varies weekly if not daily, the latest available figures showed that seven of the ten school districts at issue were at the "*high*" or "*substantial*" levels of community transmission of COVID-19 based on Virginia Department of Health data, while three showed a "moderate" level.[33] None reflected a "low" level. While the CDC community levels are lower, they are the product of other types of data (including hospitalization admission rates) and are also meant to provide a measure of "*strain on*

---

[31] *Compare* Am. Compl. ¶ 49 ("It is undisputed that '[s]tudents benefit from in-person learning, and safely returning to in-person instruction … (is) a priority."), *with* Dkt. 46 at 3 (writing that, during 2020-2021, "it became increasingly clear that 'remote learning' and 'hybrid learning' were poor substitutes for in-person learning for most students, causing significant learning loss and risking long-term developmental harm") (citations omitted).

[32] *See, e.g.*, Dkt. 5-6 ¶¶ 6–7 (describing how Q.O.'s "educational progress suffered" in 2020-2021 during a period of virtual instruction; and stating: "[i]n-person instruction provides the best mode of instruction for my child's needs"); Dkt. 5-7 ¶ 7 ("The virtual school setting did not provide adequate academic services for R.M."); Dkt. 5-2 ¶ 5 (describing difficulties in J.N.'s remote learning in 2020-2021).

[33] As of March 15, 2022, there was "high" level of community transmission in Bedford County, Chesterfield County, Cumberland County, and Loudoun County; a "substantial" level in Albemarle County, Fairfax County, and Henrico County; and a "moderate" level in Chesapeake, Manassas and York County. *See* Virginia Dep't of Health, *COVID-19 Level of Community Transmission*, https://www.vdh.virginia.gov/coronavirus/see-the-numbers/covid-19-in-virginia/community-transmission/.

*the health system*," instead of focusing on the risk of infection. As such, their relevance does not displace the significance of transmission rates in the relevant localities, when the Court considers whether Plaintiffs have shown a substantial risk that harm will occur.

Plaintiffs' declarations further demonstrate the existence of a substantial risk of harm. For example, L.R. (who is in eleventh grade and has had two kidney transplants and been diagnosed with end-stage renal disease, medication induced diabetes, and a blood clotting disorder), attends a high school in which, after mask-wearing became optional in response to the new state laws,[34] between 30 to 50 percent of students were observed without masks in the hallway and classrooms; and 6 of the 8 classmates of L.R. have not been wearing masks. Dkt. 41-5 ¶¶ 7–9. J.M. (a fifth-grade student diagnosed with Type 1 diabetes), is currently attending a school that moved to voluntary masking after E.O. 2, and that had at least "30 cases in the last 14 days" preceding the declaration. Dkt. 37-2 ¶¶ 10–16. The administration denied J.M.'s request that unmasked students be kept at least six feet from him, and the school also "recently stopped contact tracing procedures, decreasing the probability that a case of COVID-19 is identified and reported to the division." *Id.* ¶¶ 15–16. G.D. (another fifth grader with asthma, among other conditions), attends another school that moved to voluntary masking on account of E.O. 2, and in which "there is no separation of masked and unmasked students and there is not enough room in classrooms for six feet of social distancing between students." Dkt. 5-4 ¶¶ 10–12 & *id.* at 9.

This case is unlike the situation in *E.T. v. Paxton*, in which the court concluded that the plaintiffs "likely failed to demonstrate standing" because other possible accommodations, like

---

[34] Indeed, following issuance of E.O. 2 and S.B. 739, Plaintiffs' school districts followed their direction and communicated to parents that masking was optional (regardless of specific circumstances), and most cited E.O. 2 and/or S.B. 739 specifically as their reason(s) for doing so. *See infra* footnote 37.

voluntary masking, vaccination, social distancing, and others, had undermined their contention that they were in an "either/or" choice between being "either forced out of in-person learning altogether or" taking greater health risks than their peers. *See Arc of Iowa*, 24 F.4th at 1170 (discussing *E.T. v. Paxton*). Here, Plaintiffs have documented not only the existence of such an "either/or" choice, but they have provided evidence that remote learning was not a possibility either. *See, e.g.*, Dkt. 5-4 ¶¶ 4–14 (G.D. vaccinated but not eligible for booster; optional masking in school, but no separation of the masked and unmasked students and no room for social distancing; and two virtual learning programs have "no open seats"); *supra* note 18.

The Court notes that Defendants' rationale appears to try to incorporate wholesale consideration of the merits of Plaintiffs' ADA claims into the standing inquiry. The Court finds unpersuasive an attempt to close the courthouse door as a *jurisdictional matter* to any disabled person seeking to request a reasonable modification on the basis that another reasonable alternative may be available. Similarly, Defendants' injury-in-fact argument would appear to have the incongruous effect that plaintiffs who have been denied even a concededly reasonable accommodation (*i.e.*, one's ability to wear their own mask, *see* Dkt. 46 at 6, 25) *would lack standing* to sue for that reasonable accommodation under the ADA, because other measures exist that could separately mitigate COVID-19 risk. Defendants' injury-in-fact argument is undermined by such logical inconsistencies and the lack of a limiting principle.

Accordingly, the Court concludes that Plaintiffs have established an injury-in-fact as necessary to establish standing.

   2.  *Fairly Traceable & Likelihood of Redressability*

Defendants also argue that Plaintiffs lack standing because they have failed to show that their injuries are either traceable to Defendants' conduct or redressable by the Court. *See* Dkt. 46

at 15–19. They argue that neither element of standing has been met because the injuries Plaintiffs identify "result[] from the independent action of some third party." *Id.* at 15. Specifically, Defendants claim that the injunction Plaintiffs seek, enjoining E.O. 2 and S.B. 739, "would have no effect unless independent third-party actors—Plaintiffs' school boards, who are not parties to this suit—chose to re-impose universal student mask mandates." *Id.* at 16. However, Defendants contend that it would be "wholly speculative" if not "implausible" to think that Plaintiffs' school divisions would "re-impose universal masking mandates," when CDC no longer recommends universal masking for a substantial majority of Virginia's population (including 10 of the 12 of Plaintiffs' school districts), and COVID-19 case counts had plummeted. *Id.* at 16–19. Further undermining traceability and redressability in Defendants' view is their argument that *they* "do not have any special authority to enforce" E.O. 2 and S.B. 739, and instead *parents* have been filing suit to enforce E.O. 2 (and presumably S.B. 739 as well). *Id.* at 17. Accordingly, Defendants say that enjoining *Defendants* from enforcing these laws "would not free school boards from having [these laws] enforced against them." *Id.* at 17–18.

"A plaintiff's injury satisfies the traceability element of standing when there is a causal connection between the injury and the defendant's conduct complained of by the plaintiff." *Lujan*, 504 U.S. at 560; *Disability Rights of S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022) (internal quotation marks and citations omitted). And a plaintiff has standing to sue for injuries caused by "the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019). "[T]he causation element of standing does not require the challenged action to be the sole or even the immediate cause of the injury." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018). Nonetheless, "[w]hile the defendant's conduct need not be the last link in the causal chain, the plaintiff must

be able to demonstrate that the alleged harm was caused by the defendant, as opposed to the independent action of some third party not before the court." *Disability Rights of S.C.*, 24 F.4th at 901 (internal quotation marks and citations omitted).[35]

Moreover, "[a]n injury is redressable if it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). "A plaintiff's burden to establish redressability 'is not onerous': he must only 'show that [he] personally would benefit in a tangible way from the court's intervention.'" *Disability Rights of S.C.*, 24 F.4th at 903 (quoting *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d at 183, 189 (4th Cir. 2018)). Accordingly, the "*removal of even one obstacle to the exercise of one's rights*, *even if other barriers remain*, is sufficient to show redressability." *Deal*, 911 F.3d at 190 (quoting *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018)) (emphasis added).

Plaintiffs have demonstrated that their injuries are traceable to E.O. 2 and S.B. 739 and Defendants' attempts and threats to enforce them, and further Plaintiffs' injuries are redressable by an order enjoining them from doing so.

_Traceability_. Plaintiffs' schools all previously abided by S.B. 1303 and the Virginia Department of Health order that schools have mask requirements.[36] But following issuance of

---

[35] Defendants have not asserted sovereign immunity as a defense either in opposing Plaintiffs' motion for injunctive relief or in support of Defendants' motion to dismiss. Rather, they argue that Plaintiffs have not shown standing. *See* Dkts. 46, 65. However, since Eleventh Amendment immunity principles "apply with equal force in the standing context," the Court is mindful that "[t]o establish standing, a plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Disability Rights of S.C.*, 24 F.4th at 901 (cleaned up, citation omitted). However, "[w]hen a defendant has no role in enforcing the law at issue, it follows that the plaintiff's injury caused by that law is not traceable to the defendant." *Id.* at 902.

[36] *See, e.g.*, Dkt. 5 at 7; Am. Compl. ¶ 56; Dkt. 5-1 ¶ 13 (C.S.); Dkt. 5-2 ¶ 8 (J.N.); Dkt. 5-3 ¶ 6 (B.B.); Dkt. 5-4 ¶ 10 (G.D.); Dkt. 5-5 ¶ 10 (J.D.); Dkt. 5-6 ¶ 8 (Q.O.); Dkt. 5-7 ¶ 8

E.O. 2 and S.B. 739, Plaintiffs' schools and school districts followed their direction and communicated to parents that masking was optional (regardless of the circumstances), and most cited E.O. 2 and/or S.B. 739 specifically as their reason(s) for doing so.[37] Not all did. To be sure, it appears two jurisdictions only cited school board votes or the new CDC guidance as prompting their decision.[38] But the substantial majority did.

And while Defendants disclaim any "special authority to enforce E.O. 2 and S.B. 739," Dkt. 46 at 17, it is undisputed that they have contemporaneously taken the position in a state court case that their "intervention in [the] matter is necessary to enforce E.O. 2," Dkt. 50 at 16. All Defendants in this case (except Acting Commissioner Greene) moved to intervene in a Circuit Court of Loudoun County case "[t]o protect the rights of these children and their parents" who would choose not to wear masks in schools, Dkt. 45-12, and sought a temporary injunction against Loudoun County School Board actions contrary to E.O. 2. *See id.* at 1–2, 7–8. In this case, two Plaintiffs are enrolled in or would attend Loudoun County public schools, Am. Compl. ¶¶ 144, 174, Dkt. 5 at 17, further demonstrating Defendants specifically have taken action to enforce E.O. 2 relative to Plaintiffs and establishing more than a credible threat they will seek to enforce E.O. 2 and S.B. 739 in a manner that directly affects Plaintiffs.[39] *Cf. Disability Rights of*

---

(R.M.); Dkt. 37-1 ¶ 5 (C.B.); Dkt. 5-8 ¶ 6 (I.C.); Dkt. 41-1 ¶ 7 (M.K.); Dkt. 37-2 ¶ 10 (J.M.); Dkt. 37-3 ¶¶ 14–17 (L.R.); Dkt. 41-5 ¶¶ 7–10 (L.R.).

[37] *See, e.g.*, Dkt. 50-11 ¶¶ 9–11 & Dkt. 50-12 at 7 (C.S.); Dkt. 29-3 ¶¶ 6–7 & Dkt. 29-4 (B.B.); Dkt. 5-4 ¶¶ 10–11 & *id.* at 9 (G.D.); Dkt. 5-5 ¶ 11 & *id.* at 7 (J.D.); Dkt. 5-7 ¶ 9 (R.M.); Dkt. 37-1 ¶¶ 5–6 & *id.* at 11–12 (C.B.); Dkt. 29-5 ¶ 5 & Dkt. 29-6 at 2 (I.C.); Dkt. 37-2 ¶¶ 11–12 & *id.* at 7–10 (J.M.); Dkt. 41-5 ¶¶ 7–10 (L.R.); *see also* Dkt. 5 at 30 & n.43.

[38] *See* Dkts. 50-4 & 50-9; Dkt. 54-1 at 7 (referring to March 1, 2022, announcement).

[39] In addition, other direct actions by Defendant Superintendent of Public Instruction Jillian Balow, and Acting Health Commissioner Colin Greene further cabin school districts' ability to impose any amount of required masking as a reasonable accommodation, on an on-going basis. *See* Dkts. 45-6 at 4, 44-49 (directed by E.O. 2, Greene issued a health department order "rescinding" prior mandatory mask policy); Dkts. 45-6 at 4, 51-1 at 4 (directed by E.O. 2,

*S.C.*, 24 F.4th at 902–03; *see also* Dkt. 29-5 ¶ 6; Dkt. 29-7 (letter from school superintendent stating masking policy was required by ruling in that state court case); Dkt. 41-5 ¶ 8 (similar).

On this record, Plaintiffs have met their burden to show that their injuries were fairly traceable to Defendants' conduct and further that their injuries were caused by "the predictable effect of Government action on the decisions of third parties." *See Davis*, 554 U.S. at 733; *Dep't of Commerce*, 139 S. Ct. at 2566. Plaintiffs' injuries were "the foreseeable result of Defendants' threatened enforcement of [E.O. 2 and S.B. 739]: the schools and school districts have gone without mask mandates because of the law and the threat of enforcement." *See Arc of Iowa*, 24 F.4th at 1172; *see also Doe 1 v. Perkiomen Valley Sch. Dist.*, --- F. Supp. 3d ---, 2022 WL 356868, at *7 (E.D. Penn. Feb. 7, 2022) (holding that the plaintiffs' injuries "are fairly traceable to [the school district's] optional masking policy," in light of evidence that "the optional masking policy will directly contribute to an increased likelihood of contracting COVID-19," and considering that a plaintiff will have standing to sue for injuries caused by "the predictable effect of Government action on the decisions of third parties"); *R.K. v. Lee*, No. 3:21-cv-725, 2021 WL 4942871, at *9–10 (M.D. Tenn. Oct. 22, 2021) (holding that plaintiffs had shown traceability between their injuries and governor's order requiring parental choice over whether their children wore masks, because, the executive order "severely limit[ed] the accommodations [school systems] are able to provide for their students," and "impedes their ability to fully enforce the mask mandates").

<u>Redressability</u>. This inquiry asks whether Plaintiffs have shown that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *See*

---

Balow issued a new "Guidance for COVID-19 Prevention in Virginia PreK-12 Schools," which provides that parents decide whether to utilize masking as a prevention strategy).

*Friends of the Earth, Inc.*, 528 U.S. at 181. Significantly, E.O. 2 and S.B. 739 need not be the *only* barrier to Plaintiffs' requested relief; rather, "[t]he removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." *Deal*, 911 F.3d at 190 (quoting *Sierra Club*, 899 F.3d at 285).

E.O. 2 and S.B 739 and their threatened enforcement are substantial obstacles to the exercise of Plaintiffs' rights to seek reasonable accommodations by way of some masking requirement from their schools. If the Court afforded Plaintiffs their requested relief, such as by enjoining Defendants from enforcing E.O. 2 and S.B. 739 to prevent or limit Plaintiffs' schools from considering whether Plaintiffs' requests for masking are a reasonable accommodation under the ADA, the Court would be removing one very large obstacle to the exercise of their federal rights, rendering it *more than likely* that they would be able to seek a reasonable modification of that nature from their schools. As in the Court's discussion of the traceability element of standing, the fact that Plaintiffs' schools stopped their mask requirements when E.O. 2 and S.B. 739 entered into effect and most cited them as the basis for making mask-wearing voluntary, supports a strong inference that enjoining Defendants from enforcing E.O. 2 and S.B. 739 from acting to prevent or limit Plaintiffs' schools consideration of Plaintiffs' individualized request(s) for a reasonable modification, would lead to the schools' consideration of such requests to the extent required by federal law. *See Arc of Iowa*, 24 F.4th at 1172.[40]

That does not mean that lower COVID-19 case counts or new CDC guidance are irrelevant—far from it. To be sure, those considerations would make it less likely that Plaintiffs'

---

[40] *See Arc of Iowa*, 24 F.4th at 1173 ("Here, the Defendant school districts have scant discretion. If federal law requires schools impose some mask requirements to accommodate disabled students, then these Defendants, including Plaintiffs' own school districts, likely would provide those accommodations.").

schools would immediately reimpose a universal mask requirement should the Court find in Plaintiffs' favor and issue a preliminary injunction. But it is a strawman to suggest, as Defendants do, that Plaintiffs' injury is only redressable if their schools reimposed *universal mask mandates*. Dkt. 46 at 16, 19. Rather, Plaintiffs argue that they are injured by their present inability to seek *any* required masking from their schools, even that which is a reasonable accommodation under federal law. *See, e.g.*, Dkt. 50 at 1–2; Dkt. 5 at 38.[41] Enjoining Defendants from enforcing E.O. 2 and S.B. 739 as against *Plaintiffs*, as would allow them to seek such relief from *their schools*, would constitute targeted relief likely to redress Plaintiffs' asserted injury. Indeed, such a decision in Plaintiffs' favor would allow them to request that which they are entitled to under federal law and their schools be able to consider such requests, and thereby to ensure federal laws' effect in the face of otherwise applicable state laws, E.O. 2 and S.B. 739.

Accordingly, the Court concludes that Plaintiffs have demonstrated that they have standing to bring this suit.

### Exhaustion

The parties dispute whether Plaintiffs were required, before filing this suit, to exhaust their remedies under the Individuals with Disabilities Education Improvement Act (or IDEA), 20 U.S.C. § 1400 *et seq.* The IDEA "ensures that children with disabilities receive needed special education services." *Fry v. Napoleon Comm. Schs.*, 137 S. Ct. 743, 748 (2017). It also provides that if a claim under the ADA or Section 504 of the Rehabilitation Act "seek[s] relief that is also available under the IDEA, the plaintiff must first exhaust the IDEA's administrative procedures."

---

[41] *See also* Am. Compl. ¶ 11 (arguing that E.O. 2 and S.B. 739 "prohibit school districts from providing reasonable modifications (i.e., mask requirements) that Plaintiffs need in order to attend school without risking their health and lives").

*Id.* (quoting 20 U.S.C. § 1415(l)). The Court concludes that Plaintiffs' claims do not require exhaustion of remedies under the IDEA.

Defendants argue that Plaintiffs' ADA and Rehabilitation Act claims fail because Plaintiffs have "failed to exhaust their administrative remedies as required by [the] IDEA." Dkt. 46 at 20. Defendants contend that Plaintiffs' claims "seek relief that is also available under the [IDEA]," *id.*, characterizing the "gravamen of Plaintiffs' claims" as "the deprivation of a public education," *id.* at 23. Defendants rely on the Fifth Circuit's decision in *E.T. v. Paxton* for the proposition that exhaustion is required where a plaintiff alleges "the deprivation of an in-person state-sponsored education because of their risk of contracting COVID-19 without a mask mandate." *Id.* at 22 (citing *E.T.*, 19 F.4th at 767). By contrast, Plaintiffs argue that their claims are not for denial of any special education services, but rather, that they seek a reasonable modification that would provide them equal access to in-person education, which would not require exhaustion. Dkt. 50 at 18–21. In any event, Plaintiffs contend that even if exhaustion were required as a general matter, it is not in this case because requiring exhaustion would be futile and would cause Plaintiffs severe harm. *Id.* at 21–23.

The Supreme Court's decision in *Fry v. Napoleon Community Schools*, 137 S. Ct. 743 (2017), supplies the governing inquiry for whether exhaustion is required here. A "free appropriate public education" (or FAPE) under the IDEA "comprises special education and related services"—including "both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." *Fry*, 137 S. Ct. at 748–49 (quoting 20 U.S.C. §§ 1401(9), (26), (29)). All eligible children with "certain physical or intellectual disabilities" have a substantive right to a FAPE once a State accepts IDEA's funds. *Id.* at 748–49. The "individualized education program" (or IEP) is the "primary

31

vehicle" for "providing each child with the promised FAPE." *Id.* at 749. The IEP "spells out a personalized plan to meet all of the child's educational needs," and it documents the child's "current levels of academic achievement, specifies measurable annual goals for how she can make progress in the general educational curriculum, and lists the special education and related services to be provided so that she can advance appropriately toward those goals." *Id.* (internal quotation marks and citations omitted).

"The IDEA requires administrative exhaustion even for some non-IDEA suits." *Arc of Iowa*, 24 F.4th at 1174. "Section 1415(l) requires that a plaintiff exhaust the IDEA's procedures before filing an action under the ADA, the Rehabilitation Act, or similar laws when (but only when) her suit 'seek[s] relief that is also available' under the IDEA." *Fry*, 137 S. Ct. at 752 (quoting 20 U.S.C. § 1415(l)). The Supreme Court in *Fry* explained that, to meet that statutory standard, "a suit must seek relief for the denial of a FAPE," and, in considering whether a suit seeks such relief for such a denial, "a court should look to the substance, or gravamen, of the plaintiff's complaint." *Id.*; *see also id.* at 755 (holding that the IDEA "requires exhaustion when the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed in precisely that way").[42]

The statutes covering persons with disabilities include "the IDEA on the one hand, the ADA and Rehabilitation Act (most notably) on the other." *Id.* at 755. The IDEA protects only

---

[42] For instances when parents and school officials cannot agree on such issues, the IDEA "establish[d] formal procedures for resolving disputes." *Fry*, 137 S. Ct. at 749. These include the parent's ability to "file a complaint as to any matter concerning the provision of a FAPE with the local or state educational agency" as provided by state law. *Id.* If a preliminary meeting or a "full-fledged mediation process" are not successful at resolving the dispute, "the matter proceeds to a 'due process hearing' before an impartial hearing officer." *Id.* (citation omitted). The decision may be appealable to a state agency and finally, judicial review may be sought in state or federal court. *Id.*

children and adolescents, and its "goal is to provide each child with meaningful access to education by offering individualized instruction and related services appropriate to her 'unique needs.'" *Id.* (quoting 20 U.S.C. § 1401(29)). "In short, the IDEA guarantees individually tailored educational services …." *Id.* at 756. Title II of the ADA and § 504 of the Rehabilitation Act, by contrast "cover people with disabilities of all ages," both "inside and outside schools," and those statutes "enabl[e] each covered person (sometimes by means of reasonable accommodations) to participate equally to all others in public facilities and federally funded programs." *Id.* In short, Title II and § 504 "promise non-discriminatory access to public institutions." *Id.*

The Supreme Court in *Fry* developed two questions to assist courts in assessing whether a complaint concerns the denial of a FAPE: "First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school— say, a public theater or library?" *Id.* Second, "could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance?" *Id.* When the answer to the questions is yes, the Court explained that the complaint was "unlikely to truly be about" the denial of a FAPE. But when the answer is no, then "the complaint probably does concern a FAPE." *Id.*

The Court in *Fry* gave two hypotheticals. First, the Court described "a wheelchair-bound child [who] sues his school, for discrimination under Title II," but without mentioning the denial of a FAPE, "because the building lacks access ramps." *Id.* The Court noted that this lawsuit alleging that might have been brought under the IDEA in part because, "[a]fter all, if the child cannot get inside the school, he cannot receive instruction there." *Id.* Yet, in applying the two aforementioned questions, the Court explained that "the child could file the same basic complaint if a municipal library or theater had no ramps," and further still, "an employee or visitor could bring a mostly identical complaint against the school." *Id.* Accordingly, because the complaint's

33

"essence is equality of access to public facilities, not adequacy of special education," the Court explained that the IDEA "does not require exhaustion" in that circumstance. *Id.* The Court gave as its second hypothetical a case in which "a student with a learning disability sues his school under Title II for failing to provide remedial tutoring in mathematics." *Id.* at 756–57. Because the Court found it implausible that a student would make that claim against a public theater or library, or that an adult visitor or employee would sue the school "to obtain a math tutorial," that case in essence concerned the denial of a FAPE, requiring exhaustion. *Id.* at 757.

The Court also explained that it would be another "sign" that a complaint concerned the denial of a FAPE if a plaintiff had "previously invoked the IDEA's formal procedures to handle the dispute." *Id.* at 757.

The facts of the *Fry* decision are significant. The plaintiff was a child with severe cerebral palsy, which drastically limited her motor skills and mobility. She sought to bring a service dog into school with her as recommended by her pediatrician, which could help her "live as independently as possible by assisting her with various life activities," including retrieving dropped items, opening and closing doors, helping her balance, turning on and off lights, and helping her transfer to and from the toilet. *Id.* at 750–51. While the Court did not resolve the claim on the record,[43] the Court found significant the fact that the plaintiff's complaint "allege[d] only disability-based discrimination, without making any reference to the adequacy of the special education services [her] school provided." *Id.* at 758. Nor did the complaint contain any "allegation about the denial of a FAPE or about any deficiency in [her] IEP," or "accuse the

---

[43] The Court explained that further development of the record was needed on the issue whether the plaintiff originally invoked the IDEA's dispute resolution process before bringing this suit, which could shine further light on whether the gravamen of the plaintiff's complaint concerned denial of a FAPE. *Id.* at 758–59.

school even in general terms of refusing to provide the educational instruction and services that [she] needs," or "suggest[ ] any implicit focus on the adequacy of [her] education." *Id.* Rather, the Court explained that hers was a complaint that could have been made if a public library or theater refused her admittance, or similarly, that an adult visitor to the school could have made if their admittance with a service dog was prevented. *Id.*

Applying *Fry*, the gravamen of Plaintiffs' complaint in this case does not concern the denial of a FAPE. Thus, Plaintiffs were not required to exhaust their remedies under the IDEA. While the IDEA ensures children can "receive needed special education services," the complaint here does not allege any insufficiency in any "special education and related services," be it any "'instruction' tailored to meet a child's 'unique needs,'" or any "'supportive services' to permit the child to benefit from that instruction." *See Fry*, 137 S. Ct. at 748–49. The gravamen of the complaint is that E.O. 2 and S.B. 739 "prohibit school districts from providing reasonable modifications (i.e., mask requirements) that Plaintiffs need in order to attend school without risking their health and lives." Am. Compl. ¶ 11. This, they allege, causes exclusion of children with disabilities like themselves, denies them equal access to public school, interferes with the schools' ability to provide reasonable modifications under federal law, and forces parents to choose between their children's health and education, "in violation of the ADA and Section 504." *Id. See id.* ¶¶ 1–2, and 16 (Introduction), 192–94 (Title II claim), 204–06 (§ 504 claim). As in *Fry*, the complaint "alleges only disability-based discrimination, without making any reference to the *adequacy of the special education services* [their] school provided." 137 S. Ct. at 758 (emphasis added). Nor did Plaintiffs' complaint here contain any "allegation about the denial of a FAPE or about any deficiency in [their] IEP." *See id.* Indeed, Plaintiffs' claim does not reasonably fit within the purview of an IEP, which "spells out a personalized plan to meet all of

the child's educational needs," and that documents "current levels of academic achievement, specifies measurable annual goals for how she can make progress in the general education curriculum, and lists special education and related services to be provided so that she can advance appropriately toward those goals." *Id.* at 749 (citations omitted). *See Arc of Iowa*, 24 F.4th at 1176 (reasoning, "it makes little sense to pursue an IEP … where K.G.'s challenge is not to his academic achievement, but that his nurse refuses to wear a mask when administering his inhaler, and his teacher when interacting one-on-one").

The gravamen of Plaintiffs' claims is akin to that of the "wheelchair-bound child [who] sues his school for discrimination under Title II … because the building lacks access ramps" for whom exhaustion is not required, as the claims' "essence is equality of access to public facilities, not adequacy of special education." *Fry*, 137 S. Ct. at 756. Plaintiffs' claims also stand in marked contrast with the "student with a learning disability [who] sues his school under Title II for failing to provide remedial tutoring in mathematics," and for whom exhaustion would be required. *Id.* at 756–57. Like the hypothetical wheelchair-bound child, the responses to the two questions *Fry* posed are in the affirmative. First, Plaintiffs "could have brought essentially the same claim against a public hospital or other facility if it failed to require others to wear face masks because this would similarly exclude their children from the facility." *See Arc of Iowa*, 24 F.4th at 1175. And second, an adult teacher at the school, for instance, could have posed the same grievance if the lack of masking put the adult at significantly greater risk of injury or death. *See id.* At bottom, this is not a case in which Plaintiffs challenged the adequacy of individual or special education services or their IEPs. *See id.*; *Doe 1 v. Perkiomen Valley Sch. Dist.*, 2022 WL 356868, at *9 ("Because this case concerns Plaintiffs' alleged inability to access on-site school learning, due to the optional masking policy, at its core, it involves accessing the facility rather

than accessing the curriculum," and therefore "[t]he case is not a FAPE-based claim and no administrative exhaustion requirement applies"); *R.K. v. Lee*, 2021 WL 4942871, at *15–16 (holding that the plaintiffs' claims "lie outside of the ambit of the IDEA" and that therefore exhaustion of remedies under the statute was not required).[44]

Accordingly, Plaintiffs were not required to exhaust their remedies under the IDEA.[45]

### Success on the Merits

A plaintiff need not establish a "certainty of success" but still must make out a "clear showing that he is likely to succeed at trial." *Di Biase*, 872 F.3d at 230 (citing *Pashby*, 709 F.3d at 321).

Federal law, specifically Title II of the ADA, § 504 of the Rehabilitation Act, and their regulations, require public schools as a matter of federal law to afford disabled persons "reasonable modifications" from otherwise generally applicable and enforceable school policies,

---

[44] To the extent Defendants have raised the issue, Plaintiffs' attempts to secure redress from the school officials were limited in nature and do not reflect any resort to IDEA formal dispute resolution. *See* Dkt. 46 at 20 & n.15. The Supreme Court in *Fry* was clear that only the "commencement of the IDEA's *formal administrative procedures*," *i.e.*, commenced with the filing of a complaint to a local or state agency, was relevant to this inquiry. 137 S. Ct. at 757 n.11 (emphasis added); *id.* at 749 (describing "formal procedures for resolving disputes" under the IDEA). But "more informal requests to IEP Team members or other school administrators for accommodations or changes to a special education program" would not qualify, recognizing that "parents of a child with a disability are likely to bring *all* grievances first to those more familiar officials, whether or not they involve the denial of a FAPE." *Id.* at 757 n.11. Here, Defendants cite communications from Plaintiffs' parents to school administrators seeking accommodations that Plaintiffs be seated in a socially distant way from unmasked children, and that the school administrators denied the requests. *See* Am. Compl. ¶ 172; Dkt. 37-2 ¶ 15; Dkt. 29-2 ¶¶ 7–8; Dkt. 29-5 ¶ 7; Dkt. 29-8 (even qualifying that she "d[id] not consider this a special education request, but a modification request under the ADA"). Any resort to school officials therefore does not change the character of this suit, such that it would challenge the denial of a FAPE.

[45] Because the Court concludes that Plaintiffs were not required to exhaust their remedies under the IDEA, it need not further consider whether an exception to the exhaustion requirement would excuse mandated exhaustion under the IDEA.

local ordinances, or state law. The Virginia laws here, E.O. 2 and S.B. 739's rule that parents can have their children opt-out of any masking requirements—though they deal with a charged topic of great interest to many—are comparably positioned to any number of other state or local health codes, building codes or historic preservation rules, from which federal law provides disabled persons the ability to request a "reasonable modification."

But E.O. 2 and S.B. 739, by their terms, admit no exceptions to optional masking in Virginia's schools, and Defendants take the position that any requirements that students wear masks are by their nature unreasonable. To be sure, had Plaintiffs sought universal required masking in schools of an indefinite duration to accommodate their disabilities, Plaintiffs would have failed to demonstrate a clear showing they are likely to succeed on the merits. However, Plaintiffs have not asked for such sweeping relief. Yet Defendants' view is that these laws not only forbid universal masking, but *any* required mask-wearing in public schools, even if limited in time, scope, or manner.

Defendants' position is untenable. Federal law requires that schools be able to afford reasonable modifications from general policies—and state law cannot prohibit an otherwise reasonable modification to the state's own laws. Moreover, federal law requires that an individualized inquiry be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances. The Court concludes that in this case Plaintiffs have demonstrated that they are likely to succeed on the merits of their claim that E.O. 2 and S.B. 739 are preempted, to the extent that they prevent or limit Plaintiffs' school districts in Virginia from considering whether masking would be necessary as a "reasonable modification" to that otherwise applicable Virginia law.

1. Federal Law Preempts Contrary State Law

The Supremacy Clause of the Constitution "creates a rule of decision: Courts 'shall'

regard 'the Constitution,' and all laws 'made in Pursuance thereof,' as 'the supreme Law of the

Land,'" and therefore courts "must not give effect to state laws that conflict with federal laws."

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324 (2015) (Scalia, J.) (quoting

Const. Art. VI, cl. 2). State law conflicts with federal law under certain circumstances, including

when it would be "impossible" for schools "to comply with both state and federal law," and

when, "under the circumstances of [a] particular case, [the challenged law] stands as an obstacle

to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v.*

*Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (quoting *Hines v. Davidowitz*, 312

U.S. 52, 67 (1941)). There is no dispute that these principles supply the rules of decision in this

case. *See* Dkt. 5 at 24–25; Dkt. 46 at 27; Dkt. 50 at 28.

The Fourth Circuit has further clarified that Title II of the ADA "trumps state regulations

that conflict with its requirements," considering that "[r]equiring public entities to make changes

to rules, policies, practices, or services is exactly what the ADA does." *Nat'l Fed. of the Blind v.*

*Lamone*, 813 F.3d 494, 508 (4th Cir. 2016). If that were not so and "all state laws were insulated

from Title II's reasonable modification requirement solely because they were state laws … the

ADA would be powerless to work any reasonable modification in any requirement imposed by

state law, no matter how trivial the requirement and no matter how minimal the costs of doing

so." *Lamone*, 813 F.3d at 509 (quoting *Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d

144, 163 (2d Cir. 2013)).

2. ADA & Rehabilitation Act

"Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). "After thoroughly investigating the problem, Congress concluded that there was a compelling need for a clear and comprehensive national mandate to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life"—the ADA "provided that broad mandate." *Id.* at 675 (internal quotation marks and citations omitted). In addition, "Congress explicitly found that discrimination was not limited to 'outright intentional exclusion,' but it was also found in 'the failure to make modifications to existing facilities and practices.'" *Lamone*, 813 F.3d at 505 (quoting *Martin*, 532 U.S. at 675) (internal quotation marks and citation omitted).

Title II of the ADA provides, in relevant part:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides that:

> No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ….

29 U.S.C. § 794(a). In other words, "Title II forbids any 'public entity' from discriminating based on disability," while "Section 504 applies the same prohibition to any federally funded 'program or activity.'" *Fry v. Napoleon Comm. Schs.*, 137 S. Ct. 743, 749 (2017). To the extent possible, courts construe "the ADA and Rehabilitation Act to impose similar requirements." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012).

Accordingly, to make out a violation of Title II of the ADA or § 504 of the Rehabilitation Act, "plaintiffs must show: (1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." *Lamone*, 813 F.3d at 503 (citing *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)); *see also* Dkt. 5 at 20.

3.  Application

Here, there is no dispute between the parties as to the first two elements: that Plaintiffs have a disability within the meaning of Title II of the ADA and § 504 of the Rehabilitation Act, and that they are otherwise qualified to receive a public education. *See* Dkt. 5 at 21–22; Dkt. 46 at 7–8, 11–14, 24–26. Nor, for that matter, is there any dispute that Defendants are subject to the requirements of the ADA and § 504. *See id.* Rather the crux of the parties' dispute rests on the third element: whether Plaintiffs are denied the benefits of a public service, program, or activity on the basis of their disability.

In addition to prohibiting intentional discrimination based on disability, the ADA also imposes, pursuant to a federal regulation implementing Title II and upon which Plaintiffs rely,[46] an affirmative obligation that public entities "shall make *reasonable accommodations* in policies, practices, or procedures *when the modifications are necessary* to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. 35.130(b)(7). Similarly, Section 504 of the Rehabilitation Act "demand[s] certain 'reasonable' modifications to existing practices in order to 'accommodate' persons with disabilities." *Fry*, 137 S. Ct. at 749

---

[46] *See* Am. Compl. ¶ 192; Dkt. 5 at 20, 23–24; Dkt. 50 at 18, 26.

(quoting *Alexander v. Choate*, 469 U.S. 287, 299–300 (1985)). In other words, "[u]nder the ADA, a failure to make a reasonable modification is itself an act of discrimination unless the place of public accommodation can demonstrate that implementing the modification would fundamentally alter the nature of the program." *J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 676 (4th Cir. 2019) (citation omitted). That does not mean that Title II "require[s] States to employ any and all means" to make the public services available; rather, it "requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided …." *Tennessee v. Lane*, 541 U.S. 509, 531–32 (2004).[47]

   a.   *Whether Plaintiffs Have Requested Modifications*

   At the outset, Defendants contend that "a plaintiff generally 'must make an adequate request' for a reasonable accommodation under the ADA, 'thereby putting the [defendant] on notice' of the plaintiff's disability." Dkt. 46 at 24 (quoting *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346–47 (4th Cir. 2013)). Defendants argue that because here Plaintiffs "have *not requested a reasonable accommodation before bringing suit*, they must 'demonstrate that the reasonable accommodation they proposed to the court' is both 'necessary and obvious.'" *Id.* at 24 (quoting *E.T.*, 19 F.4th at 768) (emphasis added).

   However, numerous Plaintiffs have done just that—asked their schools or administrators for masking to various extents as a modification (notwithstanding E.O. 2 or S.B. 739), to protect their children's health in school as a reasonable accommodation. *See, e.g.*, Dkt. 50-11 ¶¶ 9–12 (describing communications with C.S.'s school board, and "explain[ing] that universal masking

---

[47] In opposing Plaintiffs' motion for injunctive relief, Defendants have not argued that requiring masking would "fundamentally alter the nature of the service, program, or activity." *See* 28 C.F.R. § 35.130(b)(7); *see also* Dkt. 46 (Defendants' opposition brief).

is necessary for C.S. to safely attend school in-person, and that the [ADA] requires schools to provide accommodations so that students such as C.S. can attend school safely"); Dkt. 29-2 ¶¶ 5–13 (providing school administrators letter from J.N.'s doctor recommending that, "during times of high COVID-19 transmission, J.N. and those around him should wear a mask"); Dkt. 50-3 ¶¶ 4–7 (describing request as "an accommodation or modification that will provide [J.N.] access to school under the [ADA]," and stating that the school system "denied [his parent's] request for reasonable accommodations for [J.N.]"); Dkt. 50-13 ¶¶ 9–12 (describing contact with county school official and school principal "to request that the school return to universal masking or to provide accommodations for J.D. and his siblings"); Dkt. 50-15 at 3 (responding to request for "updates regarding masking or guidance regarding accommodations or modifications … [for J.D.], who has cystic fibrosis," stating that absent a court decision allowing it, "we are continuing with the parental opt out for masks").

J.M.'s and C.B.'s school system appeared to preemptively reject possible accommodation following E.O. 2 in communications to parents. The school system communicated that, when E.O. 2 became effective, parents and guardians could "choose if their child wears a mask in school." Dkt. 37-2 ¶ 12; *id.* at 7; Dkt. 37-1 ¶ 6; *id.* at 12. They further wrote: "It is important to note that we will not be able to accommodate requests for class changes or special seating assignments due to mask preference." *Id.* In another case, in response to an email from I.C.'s school informing parents about S.B. 739 and the school's upcoming "shift in safety protocols to allow parents to opt out their children from the mask requirement," I.C.'s parent asked the school administration for "a modification request under the ADA"—specifically that "students in proximity to [I.C.] be masked." Dkt. 29-6 at 2; Dkt. 29-8 at 1. The school's prompt response laudably offered alternatives: "[f]or today, until we can formulate a concrete plan," the proposal

was to "invite [I.C.] to sit at the teacher's desk," and then teachers could "rework their seating charts." Dkt. 29-8 at 2; Dkt. 29-5 ¶ 7. However, even then, there was no indication that the school saw it could permit some amount of masking if it was a "reasonable accommodation" under the ADA. Accordingly, the Court disagrees with Defendants that Plaintiffs did not request modifications.

     b. *Whether Masking is Reasonable Modification Necessary to Avoid Discrimination*

The parties' dispute centers on the reasonableness and necessity of Plaintiffs' proposed modification: that their school districts be able to make their own determinations to "modify their policies to impose any type of mask requirement." *See* Dkt. 50 at 18, 28. The Fourth Circuit has explained that "[a] modification is reasonable if it is 'reasonable on its face,' or used 'ordinarily or in the run of cases' and will not cause 'undue hardship.'" *Lamone*, 813 F.3d at 507 (quoting *Halpern*, 669 F.3d at 464); *see also* Dkt. 50 at 26. Moreover, the regulation implementing Title II also requires a public entity "to make '*reasonable modifications*' to its 'policies, practices, or procedures' *when necessary* to avoid such discrimination." *Fry*, 137 S. Ct. at 749 (quoting 28 C.F.R. § 35.130(b)(7)) (emphases added). Plaintiffs have the burden to demonstrate that a requested modification is both necessary and reasonable, while Defendants have the burden of proving that the requested modification would be a fundamental alteration. *J.D.*, 925 F.3d at 671 (citing *Lamone*, 813 F.3d at 507–08).

In assessing whether Plaintiffs' requested modification is "reasonable on its face," or used "ordinarily or in the run of cases" and will not cause "undue hardship," significantly, the Court is not writing on a blank slate. Several courts have already ruled that some resort to required masking is or can be a reasonable accommodation under the ADA or § 504, state or local laws notwithstanding. *See, e.g.*, *Arc of Iowa*, 24 F.4th at 1177, 1181–82; *Doe 1 v.*

*Perkiomen Valley Sch. Dist*, 2022 WL 356868, at \*19; *Doe 1 v. N. Allegheny Sch. Dist.*, No. 2:22-cv-55, 2022 WL 170035, at \*7 (W.D. Pa. Jan. 17, 2022); *R.K. v. Lee*, 2021 WL 4942871, at \*12–13; *but see E.T. v.* Paxton, 19 F.4th 760, 766 (5th Cir. 2021).

Plaintiffs have introduced substantial record evidence that masking in some form is *necessary* for them, especially considering that many of their treating physicians told them that it was unsafe to return if masking was optional and that other risk mitigation strategies were not a substitute for masking. *See J.D.*, 925 F.3d at 671; Dkt. 50-10 ("Based on advice we have received from C.S.'s physicians, one-way masking would not be sufficient to adequately protect C.S. from COVID-19 such that he could safely attend school in person."). [48] Moreover, Plaintiffs introduced substantial evidence that would foreclose other risk-mitigation measures as providing adequate alternatives to masking. *Compare E.T.*, 19 F.4th at 769. For example, Plaintiffs were vaccinated against COVID-19 to the extent medically possible, *see supra* p. 7–9 & notes 9–15, but even vaccinated, they remain at increased risk of severe injury or death if they contract COVID-19, *supra* note 15. Plaintiffs also introduced evidence that other measures such as voluntary masking, social distancing, and plexiglass did not afford sufficient protection without some amount of required masking. *See* Dkt. 5-2 ¶¶ 9–10 (attesting to J.N.'s social distancing steps, but pediatrician recommended without mask mandate that J.N. will be forced to withdraw; Dkt. 50-3 ¶¶ 4–9 (requesting J.N. be socially-distanced from unmasked children; which school denied, because they could not ensure he wouldn't be around unmasked children at all times); Dkt. 5-4 ¶ 12 (at G.D.'s school, no separation of masked and unmasked students and not enough room for social distancing); Dkt. 41-5 ¶ 9 (since masking made voluntary, estimated that 30 to

---

[48] *See also* Dkt. 5-1 ¶ 17 (C.S.); Dkt. 37-6 (J.D.); Dkt. 37-5 (B.B.); Dkt. 5-2 at 4 (J.N.); Dkt. 5-7 ¶ 5 (R.M.); Dkt. 5-6 ¶ 9 (Q.O.); Dkt. 41-5 ¶ 10 (L.R.).

50 percent of students in L.R.'s school do not wear masks, and 6 of 8 students in her class do not). To be sure, the ADA does not require a school to afford a student a perfect modification or even his or her preferred modification. *See Fink v. Richmond*, 415 F. App'x 719, 722 (4th Cir. 2010) (unpublished); *E.E.O.C. v. Newport News Shipbuilding & Drydock Co.*, 949 F. Supp. 403, 408 (E.D. Va. 1996). But on this record and in this case, Plaintiffs have the better of the argument that masking is a necessary modification and COVID-19 risk mitigation measure for them, notwithstanding other steps that have been (and might be) taken to reduce risk.

Focusing on reasonableness, Plaintiffs have introduced evidence that requiring students to wear masks in schools is effective at reducing the spread of COVID-19. Dkt. 5 at 5–7; Dkt. 5-12 ¶¶ 32–43 (Decl. of Dr. Garner.); Dkt. 50 at 3–5; Dkt. 50-1 ¶¶ 19–22 (Decl. of Dr. Smith). For example, in February, CDC wrote that it "recommends universal indoor masking by all* students (ages 2 and older), staff, teachers, and visitors to K-12 schools, regardless of vaccination status."[49] The American Academy of Pediatrics and American Medical Association "similarly recommend[ed] universal masking as part of school openings." Decl. of Dr. Garner ¶ 34 & n.20. Plaintiffs have cited numerous studies regarding the effectiveness of wearing masks at mitigating transmission of COVID-19 in indoor settings, such as schools. *See id.* ¶¶ 37(a)–(f); *id.* at ¶ 37(b) (citing Duke University study of North Carolina K-12 schools—including nearly 1.3 million students and 160,000 staff—in which schools participating in a plan that "provided full, in-person instruction, masking, and minimal physical distancing" were found to have "very limited

---

[49] CDC, Guidance for COVID-19 Prevention in K-12 Schools, https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html (last visited Mar. 16, 2022). The asterisk explained that exceptions could be made for those who "cannot wear a mask or cannot safely wear a mask, because of a disability" under the ADA, or for persons "for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations."

within-school transmission of COVID-19," which prompted researchers to conclude: "wearing masks is an effective strategy to prevent in-school COVID-19 transmission").

Defendants repeatedly respond "that student mask mandates are largely ineffective at reducing COVID-19 transmission," and they describe "[m]ounting evidence" as supporting that conclusion. Dkt. 46 at 1, 4; *see also id*. at 8, 14, 16, 19, 25–26 (describing mask mandates in schools as "ineffective"). That characterization is not borne out by the evidence that Defendants submitted. One cited document from the United Kingdom described numerous studies tending to show masking *is effective*.[50] Another noted a lower incidence of COVID-19 among the schools that required students to wear masks (though not a statistically significant difference from those where masking was optional). However, that study also went on to conclude that, "[b]ecause universal and correct use of masks can reduce SARS-CoV-2 transmission … and is a relatively low-cost and easily implemented strategy," the report "suggest[ed] universal and correct mask use is an important COVID-19 prevention strategy in schools as part of a multi-component approach").[51] That is not to say no record evidence casts doubt on or suggests limited efficacy of required masking in schools. *See* Greene Aff. ¶ 19 & n.36. But the record does not contain such evidence as would undermine a showing that Plaintiffs can ask for some masking as a reasonable accommodation, considering as well the evidence from Plaintiffs' treating physicians who advised them against going back to school in a voluntary-masking environment. *See Supra* p. 20–21 & note 30.

---

[50] *See* Dkt. 44-27 at 8–9 (U.K. Department of Education, *Evidence Summary: Coronavirus (COVID-19) and the Use of Face Coverings in Educational Settings* (Jan. 2022) (describing, e.g., CDC studies that "generally find higher rates of COVID-19 in schools without mask requirements, compared to those with mask requirements").

[51] *See* Dkt. 44-57 at 3 (Jenna Gettings, et al., *Mask Use and Ventilation Improvements to Reduce COVID-19 Incidence in Elementary Schools – Georgia*, MMWR (Nov. 16 – Dec. 11, 2020)).

Similarly, Plaintiffs argue and introduce evidence that requiring masking is a *safe* practice for students, as well as being effective. Decl. of Dr. Smith at 7; *see also id.* at ¶¶ 19–30. Defendants respond that required masking is in fact "harming other children." Dkt. 46 at 1; *see also id.* at 5–6, 26. They contend that "mask-wearing can be detrimental to speech and language development," and can otherwise cause difficulties in communication and making or developing social connections. Dkt. 44 ¶ 14. Plaintiffs' expert takes issue with the studies cited as limited in size or scope, Dkt. 50-1 ¶¶ 23(b) (concerning data from 10 children aged 6-7 years old in Greece), *id.* ¶ 23(c) (122 Italian adults); *id.* ¶ 23(f) (191 German adults); that they had not yet been subjected to peer review, *id.* ¶¶ 23(a), (b); or noting limitations in the data collected or in the conclusions drawn, *id.* ¶ 23(a) ("This study did not assess whether masks affect the cognitive scores of children, and in fact did not even collect any information about whether the children wore masks."). Moreover, Defendants argue that "[g]overnments and experts abandon universal student masking in schools," citing guidance from certain international organizations, including the United Nations Children's Fund (UNICEF) and the World Health Organization (WHO), as well as the recent examples from states that ended universal masking requirements. Dkt. 46 at 8, 25–26; *see also* Greene Aff. ¶ 17.

Defendants only get limited mileage out of referring to recent school-mask measures in other states. *See* Green Aff. ¶ 17. Unlike E.O. 2 and S.B. 739, when Connecticut, Delaware and New Jersey removed state-wide school-mask mandates, they gave the decision over to the *localities* whether masking would continue to be required in their schools. *Compare* Dkts. 44-19, 44-20, and 44-21. By contrast, E.O. 2 and S.B. 739 *prevent* localities from making that decision. Moreover, to be sure, the CDC may not currently recommend "universal masking for the vast majority of schools in America," as Defendants argue, Dkt. 46 at 25, but any change was not

based on any CDC finding that masking was ineffective or unsafe. And regardless, whether "universal masking" is reasonable is not the issue before the Court.

Far from demonstrating that masking is *per se* unreasonable, Defendants' evidence highlights the necessity of *individualized determinations of reasonableness* as to Plaintiffs' requests for masking. *See Martin*, 532 U.S. at 688 ("an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances, and yet at the same time not work a fundamental alteration"). For instance, WHO guidance (on which Defendants rely), advises that "children aged 12 and over *should wear a mask* under the same conditions as adults." Dkt. 44-22 at 2 (emphasis added). Defendants' arguments that masking is unreasonable for many of Plaintiffs' classmates in grade 6 and above (Q.O., R.M., I.C., L.R.) are therefore substantially undermined for that age-range based on their own evidence. Moreover, while Defendants argue that masking can be especially harmful to certain groups, including children with certain disabilities and mental conditions, Dkt. 46 at 26, it appears the parties have common ground that those students should not, in any event, be forced to wear a mask on account of their disability. *See* Greene Aff. ¶ 15 & n.26; Dkt. 50 at 6 n.10.

Defendants argue that Plaintiffs' position is "unprecedented," thereby highlighting its unreasonableness. Dkt. 46 at 26. They cite authority for the proposition that, "[a]lthough immunocompromised children have always been present in our schools, and communicable diseases have always circulated, prior to COVID-19 there was never any argument for mandatory, indefinite, universal masking in schools—much less the argument that the failure of a school district to mandate universal masking constitutes a violation of federal law." *Id.* (citing *Doe 1 v. Upper St. Claire Sch. Dist.*, --- F. Supp. 3d ---, 2022 WL 189691, at *15 (W.D. Pa. Jan.

21, 2022)). That's true, as far as it goes. Notwithstanding the recent opinions holding masking laws in COVID-19 pandemic as reasonable modifications, Plaintiffs have cited no identical earlier case, and the Court is aware of none. But Defendants fail to account for cases going back decades in which plaintiffs with similar ailments (including respiratory ailments) brought claims under the ADA or the Rehabilitation Act seeking reasonable modifications limiting third parties' freedom to act in their presence. *See, e.g.*, *Staron v. McDonalds Corp.*, 51 F.3d 353, 358 (2d Cir. 1995) (in ADA suit by three children with asthma and a woman with lupus, court of appeals reversed the district court's holding that a smoking ban in all defendants' restaurants was unreasonable as a matter of law, requiring a fact-specific inquiry); *Heather K. by Anita K. v. City of Mallard, Iowa*, 946 F. Supp. 1373, 1389 (N.D. Iowa 1996) (in Title II ADA suit brought by child with severe respiratory and cardiac conditions, court held that genuine disputes of material fact precluded summary judgment to defendant city whether its modifications to its open burning ordinance were reasonable modifications under the ADA). In other words, suits of this nature are not without precedent—far from it. And like their more recent analogues, such claims required a "fact-specific, case-by-case inquiry" whether the proposed modification was reasonable. *Staron*, 51 F.3d at 356–57; *Heather K. by Anita K.*, 946 F. Supp. at 1389.

Accordingly, in this case, Plaintiffs have demonstrated that they are likely to succeed on the merits of their claim that E.O. 2 and S.B. 739 are preempted, to the extent that they would prevent or limit Plaintiffs' school districts from considering in the first instance Plaintiffs' individualized requests whether some amount of masking is a "reasonable modification" to which they are entitled under the ADA and § 504 of the Rehabilitation Act.[52]

---

[52] Because the Court concludes that E.O. 2 and S.B. 739 are likely preempted in part by the ADA and § 504 of the Rehabilitation Act, the Court need not consider Plaintiffs' alternative

**Irreparable Harm**

To secure a preliminary injunction, Plaintiffs must establish that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Showing that there is only "a possibility of irreparable harm" is insufficient. *Id.* at 22. In this case and on this record, the Court finds that Plaintiffs have established that they are likely to suffer irreparable harm without preliminary relief, on the basis that they are experiencing and will continue to experience irreparable injuries because of E.O. 2 and S.B. 739.

Specifically, Plaintiffs have "provided evidence, including expert affidavits, that exposure to COVID-19 places them at heightened risk of severe illness or death,"[53] evidence that transmission of COVID-19 in their communities and schools specifically presents an acute, ongoing risk,[54] substantial evidence including from Plaintiffs' treating physicians that in a voluntary-masking environment created by these laws it would be unsafe for Plaintiffs to return to in-person instruction,[55] and "that alternatives to in-person attendance" are either unavailable or lacking equivalent or substantially comparable educational opportunity[56]—which "harms suffice as irreparable." *See Arc of Iowa*, 24 F.4th at 1180; *see also Perkiomen Valley Sch. Dist.*, 2022 WL 356868, at *25 (explaining that "[t]he inability to access education constitutes irreparable harm because it is of critical importance to child development and its loss cannot be compensated with monetary damages"). The evidence underlying the Court's finding that

---

argument that the Federal Rescue Plan Act of 2021, Pub. L. 117-2, 135 Stat. 4 (Mar. 11, 2021), also preempts those state laws. *See* Dkt. 50 at 28.

[53] *See, e.g.*, *supra* at pp. 7–8, 19–20 & accompanying notes.

[54] *See, e.g.*, *supra* at pp. 22–23 & note 33.

[55] *See, e.g.*, *supra* at pp. 21–22 & note 30, p. 45 & note 48.

[56] *See, e.g.*, *supra* at pp. 9–10 & notes 17–18.

Plaintiffs have established injury in fact and traceability of their injuries for purposes of the Court's standing inquiry, also supports this Court's conclusion that Plaintiffs have shown a likelihood of irreparable harm absent injunctive relief. *See supra* at pages 18–29.

### Balance of the Equities & The Public Interest

Plaintiffs must further show that "the balance of equities tips in [their] favor" and that "an injunction is in the public interest," to secure a preliminary injunction. *Winter*, 555 U.S. at 20. In a case, as here, where the government is the opposing party, these two factors may be considered together. *See Roe v. Dep't of Defense*, 947 F.3d 207, 230 (4th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The Court finds that on this record and in this case, these factors also weigh in Plaintiffs' favor.

As Defendants contend, States have an interest in seeing that their statutes are given effect. Dkt. 46 at 38–39 (citing, e.g., *Maryland v. King*, 567 U.S. 1301, 1303 (2021) (Robert, C.J., in chambers)). However, the Supremacy Clause provides that federal law is supreme in the event of a conflict, and therefore any State interest in enforcement of its laws must comparably give way when they conflict with federal law. *See, e.g.*, *Lamone*, 813 F.3d at 508 (explaining that "the mere fact of a state statutory requirement" cannot "insulate[] public entities from making otherwise reasonable modifications to prevent disability discrimination"); *Mary Jo C.*, 707 F.3d at 163 ("Title II's reasonable modification requirement … requires preemption of inconsistent state law when necessary to effect a reasonable required modification."). Similarly, ensuring that the ADA's reasonable accommodation provisions are given effect notwithstanding contrary state law supports the public interests underlying the ADA itself, in "eliminat[ing] discrimination

against disabled individuals, and to integrate them into the economic and social mainstream of American life." *See Martin*, 532 U.S. at 674.[57]

In addition, the Court considers that the public health of more students in Virginia's schools—more than just Plaintiffs themselves—will be protected to a greater extent, on account of the schools' ability to consider some limited amount of required masking, where necessary and reasonable, in order to accommodate those with disabilities. *See* Dkt. 5 at 36; Decl. of Dr. Garner ¶¶ 37–41; Decl. of Dr. Smith ¶¶ 19–22; *see also supra* at pp. 46–47 & notes 49–51. To be sure, no party argues that masking is a panacea. But, notwithstanding Defendants' evidence of limitations on the efficacy of masking in schools or other drawbacks, the Court finds that issuing the requested injunction would afford schools greater ability to afford greater protections for students' health risk from COVID-19, which further supports the public interest. *Cf. Pashby*, 709 F.3d at 331 (explaining that "the public interest in this case lies with safeguarding public health" rather than with state budgetary considerations). The Court is mindful of Defendants' contrary arguments that an injunction "would not serve the public interest given that student mask mandates are no longer generally recommended by the CDC, and are detrimental to many children's academic, social, and emotional development, and to their mental health." Dkt. 46 at 31. Shared experience and common sense reflect that, at a minimum, having to wear a mask can be uncomfortable, especially for extended periods. It is no small thing for schools or health

---

[57] *Cf. Sak v. City of Aurelia, Iowa*, 832 F. Supp. 2d 1026, 1047 (N.D. Iowa 2011) (holding that "the national public interest in enforcement of the ADA 'trumps' the more local public interest in public health and safety reflected in the Ordinance prohibit pit bulls"). The Court's earlier determination that Plaintiffs are likely to prevail on the merits and have shown E.O. 2 and S.B.739 prevent them from being able to ask for and obtain reasonable modifications under the ADA and § 504 of the Rehabilitation Act, further supports the Court's conclusion here: that the public interest in this case is meaningfully advanced by giving effect to those federal laws. *See supra* at pp. 37–50.

officials to ask (or require) persons to wear masks for substantial periods in order to reduce risk of spread of COVID-19.

Nonetheless, the Court simply is not presented with any issue in this case that would require the Court to weigh costs and benefits of, on the one hand, universal masking and on the other, parental choice. *See* Dkt. 46 at 31–32; *cf. Arc of Iowa*, 24 F.4th at 1181 (holding that injunction sought "would not implicate comity [concerns]" because issuing any injunction only of the "proper scope … would maintain [the state law's] ban on mask requirements where this ban does not violate federal law"). Rather, in this case, the balance of equities and public interest considerations are cabined by the scope of the injunctive relief the Court has determined is appropriate as set forth below: namely, that *Plaintiffs' schools or school districts* may consider whether *Plaintiffs'* individualized requests for some amount of masking qualify as a reasonable modification under the ADA. Particularly in view of the limited injunctive relief afforded, any countervailing burdens and equities—to the extent they may result if Plaintiffs' schools impose some amount of masking as a reasonable modification—are not present to any degree that would compel a contrary conclusion on these factors at this point of the litigation.

Accordingly, in this case and on this record, the balance of equities and public interest factors tip in Plaintiffs' favor.

### Scope of the Injunction

This case concerns these twelve Plaintiffs and their ability to seek relief from their schools for some limited masking requirement, as a reasonable modification of otherwise governing state law (E.O. 2 and S.B. 739). Because "[a]n injunction must be tailored to remedy the specific harm suffered," *Arc of Iowa*, 24 F.4th at 1181, Plaintiffs are not entitled to broader relief than that which affects them personally. "Plaintiffs are not harmed by the absence of mask

requirements at schools their children do not attend." *See id.* This is not a class action, and

Plaintiffs lack any legal right to assert the rights of others not before the Court. In addition, other

schools may not have any disabled students as would require some amount of masking as a

reasonable modification. E.O. 2 and S.B. 739 remain in effect and may be enforced under such

circumstances too. *Arc of Iowa*, 24 F.4th at 1181 ("to the extent that some schools in Iowa do not

encounter anyone whose disabilities require the schools to make others wear masks, Section

280.31 may prohibit those schools from imposing mask requirements without violating federal

disability law"). Accordingly, the scope of the Court's injunction will be limited: it will enjoin

*Defendants* from enforcing E.O. 2 and S.B. 739 *only to extent that* their actions would seek to

prevent or limit *Plaintiffs' schools or school districts* from considering, in the first instance,

whether *Plaintiffs'* individualized requests for masking constitute a reasonable modification

under federal law.[58]

## Conclusion

E.O. 2 and S.B. 739 are the law in Virginia and they remain in force, affording parents

the choice whether their children should wear masks to school, notwithstanding any school rule

that would require students to wear masks.

The Court's decision and injunction today directly impact only the twelve Plaintiffs in

this case. The Court enjoins Defendants from enforcing E.O. 2 and S.B. 739 only as against these

Plaintiffs in their ability to *ask for* (not definitely to *receive*) from *their schools* some amount of

---

[58] *Amicus* Fairfax County School Board, which has filed a brief in support of Plaintiffs, contended that S.B. 739 is unlawful as a matter of Virginia law because it violates the Virginia constitution—a position that has not been advanced in this case by Plaintiffs. *See* Dkt. 54-1. The Court appreciates the argument of this *amicus*, but need not address it in this opinion because, even if S.B. 739 were lawful as a matter of Virginia law, the Court would still hold that federal law has preempted S.B. 739 as set forth herein.

masking as a reasonable modification. Simply put, federal law demands just such a fact-specific inquiry into reasonableness, and E.O. 2 and S.B. 739—just like any other state law—cannot preclude Plaintiffs from asking for some required masking as a reasonable modification, nor can they bar Plaintiffs' schools from implementing some required masking, if in fact, it would constitute a reasonable modification under federal law.

An accompanying Injunction shall issue, granting in part Plaintiffs' motions for preliminary injunctive relief to the extent set forth above. Dkts. 4, 29.

The Clerk of Court is directed to send this Memorandum Opinion to all counsel of record.

Entered this 23rd day of March, 2022.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE